UPPER CHEHALIS TRIBE, Lower Chehalis Tribe, Chehalis Tribe, Satsop Tribe, Humptulip Tribe, Hoquiam Tribe, Confederated Tribes of the Chehalis Reservation and Portions and Descendants of Such Tribes and Bands, Ralph A. Heck, Frank F. Pete and Murphy Seneca as Individual Members of the Chehalis Tribe and Individually and On Behalf of All Other Members of the Chehalis Tribe and Subordinate Bands Not Members of the Confederated Tribes of the Chehalis Reservation,

v.

The UNITED STATES.

Appeal No. 1–56.

United States Court of Claims.

Oct. 9, 1957.

Joseph W. Creagh, Arlington, Va., for appellants.  E. L. Crawford, Salem, Or., was on the briefs.

Donald R. Marshall, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for appellee.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

PER CURIAM.

This is an appeal from a decision by the Indian Claims Commission in Docket No. 237, 4 Ind.Cls.Com. 301, dismissing the petition filed by the Indian claimants. Appellants take the position that there is no substantial evidence to support the ultimate findings of the Commission adverse to appellants and that the final determination of the Commission based upon such findings should be reversed.

In finding 23 the Commission finds that in the area claimed there were aboriginally a number of autonomous villages or tribelets known as the Copalis Tribe, the Humptulip Tribe, the Satsop Tribe, the Lower Chehalis Tribe, the Sachal Tribe, the Staktamish (Upper Chehalis) Tribe and possibly other village tribes on the Hoquiam and Wynochee rivers in what is now the State of Washington; that there is no evidence that aboriginally and prior to 1855 (year of alleged taking) there was any merger of these village tribes in the claimed area into either a Chehalis Tribe or into two tribes, i. e., the Upper Chehalis and the Lower Chehalis tribes.  Earlier in the findings, the Commission found that the villages in question were strictly autonomous, and that the chief of each village had power only in the village he represented; that although neighboring villages did sometimes function together as a single unit for some purposes, political autonomy was rigidly maintained for the most part.  From this, the Commission appears to conclude that the village tribes involved herein were not tribes, bands or identifiable groups of American Indians within the meaning of section 2 of the Indian Claims Commission Act and that their descendants or representatives of their descendants would accordingly have no standing to bring a claim against the United States under the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C.A. § 70 et seq.

The Commission also found that the village units made limited use, if any, in 1855 of any area of land except in the immediate vicinity of their villages and

that the exact location of those villages and the areas of exclusive use and occupancy were not shown by the record. Finally, the Commission found that there was no evidence that the appellants were the successors in interest of the village groups in question, or from what groups the "Confederated Tribes of the Chehalis Reservation" were organized or formed.

■ After consideration of the record in this case, the briefs and arguments of counsel, and in view of the purposes of the Indian Claims Commission Act, the background of the various Indian tribes and groups, and the authorities on the subject of Indian affairs and modes of living, we are of the opinion that the Upper Chehalis and the Lower Chehalis Indians constituted tribes or identifiable groups of Indians within the meaning of the Indian Claims Commission Act. We are also of the opinion that the evidence in the record does not support the findings of the Commission and its conclusion that there was no political organization of the Upper Chehalis Indians and the Lower Chehalis Indians to the extent necessary to constitute tribes or other identifiable groups of American Indians. Neither is there substantial evidence to support the finding and conclusion of the Commission that the Upper and Lower Chehalis Indians did not use and occupy at least their villages and the land surrounding them as identifiable groups or bands of Indians. Absolute accuracy of location and extent of occupancy is not essential, and the record in this case is sufficient for the Commission to determine with reasonable accuracy the location and extent of the areas actually occupied by the tribes involved herein. Snake or Piute Indians v. United States, 112 F.Supp. 543, 125 Ct.Cl. 241; Alcea Band of Tillamooks v. United States, 59 F.Supp. 934, 103 Ct.Cl. 494, affirmed 329 U.S. 40, 67 S.Ct. 167, 91 L.Ed. 29; Nooksack Tribe of Indians v. United States, 1 Ind.Cls.Com. 333, and 3 Ind.Cls.Com. 479; Muckleshoot Tribe of Indians v. United States, 2 Ind.Cls. Com. 424, 3 Ind.Cls.Com. 658. In the

last two cases cited, the Commission was concerned with problems very similar to those involved in the instant case, including the sort of tribal organization, i. e., autonomous village bands, and the mode and extent of land occupancy and use by such bands. Furthermore the agents of the United States were negotiating with the Muckleshoot and Nooksack tribes at about the same time and in the same manner as they were with the Chehalis groups of Indians. In those two cases, the Commission found that while the record did not support use and occupancy of the large area claimed, the records did support findings of exclusive use and occupancy of certain areas within the confines of the immediate village areas as indicated by the testimony of the claimants' expert witnesses and the maps prepared by them. In the Muckleshoot case the Commission made particular reference to the common practice of exogamy in that area and stated at page 675 of its decision:

"The practice of exogamy, which was so prevalent among these people, created ties of kinship and friendship among them which led to a natural tendency to share with each other. As a result of this way of life there developed close cultural ties among these people. All these ties existed prior to 1857 when these Indians were consolidated by the defendant at Muckleshoot reservation. From 1857 or possibly a little earlier these Indians *were treated as an entity by the defendant* and as a result gradually became completely merged until by 1868 or 1870 they were designated as a unit by the Indian agents and others who dealt with them. It appears to this Commission that to deny the Muckleshoot Tribe the right to recover for lands occupied by the villages whose people were so closely associated economically and culturally on the grounds of lack of political cohesion would be to misconstrue the beneficient purpose of Congress in enact-

ing the legislation under which this claim is maintained. This seems particularly true when considered in the light of the type of cultural and economic structure existing among the Indians of the Puget Sound area. The heretofore mentioned practice of exogamy and the subsequent ties of kinship and cultural life and more or less economic cohesion warrants the assertion by the descendants of this day and time, as an entity, of the claim for the losses sustained by the original groups of which they are descendants." [Italics supplied.]

On the matter of defining the area used and occupied exclusively by the village Indians, the Commission stated in the Nooksack case and repeated in the Muckleshoot case, at page 677, as follows:

"It is perhaps not required that the boundary lines be as accurately defined as a surveyor would like them but some general boundary lines of the occupied territory must be shown, and it must be shown that the occupant had the possession to the exclusion of other tribes; constructive possession is not sufficient.

\* \* \* \* \* \*

" \* \* \* it is extremely difficult to establish facts after the lapse of time involved in matters of Indian litigation. In attempting to establish boundaries and occupancy on the basis of fragmentary facts and often uninformed opinions and the work of ethnologists who must of necessity base their conclusions upon much the same information, it becomes necessary to take a common sense approach based upon experience with matters of this nature. \* \* \* Snake or Piute Indians v. United States, 112 F. Supp. 543, 125 Ct.Cl. 241, 254: \* \* \* "

We are of the opinion that the approach of the Commission to the problems in the Nooksack and Muckleshoot cases was a sound and reasonable one, and that the problems in the instant case, being nearly identical, would seem to be amenable to a similar approach.

Appellee contends that appellants' claim does not fall under clause (4) of section 2 of the Indian Claims Commission Act. Although the Commission has not expressed itself on this matter, we are of the opinion that the claim does come within the meaning of that clause which provides that the Commission shall have jurisdiction of "claims arising from the taking by the United States, whether as a result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant." While the language of that clause is somewhat ambiguous, when read in connection with the other clauses of section 2 of the Act, and in the light of the legislative history, it appears that Congress intended clause (4) to cover those land claims which were not cognizable under clause (1) (claims arising under the Constitution, laws, treaties of the United States, and executive orders of the President), either because the land involved in the claim was held by so-called Indian or aboriginal use and occupancy title, rather than by some form of recognized title, or because, if the land was held by some form of recognized title, there had been no taking of it in the constitutional sense. The sort of taking referred to in clause (4) could come about in several ways, such as where lands held by Indian title were not ceded by the Indians, or were not affirmatively appropriated by the United States by statute, executive order, or the like, but were acquired under the public land laws or by some administrative action. In any event, it is clear from the language of clause (4) and from the legislative history of the Act, that clause (4) was intended to embrace claims based on the taking of lands held by so-called Indian or occupancy title. Otoe

and Missouria Tribe v. United States, 131 F.Supp. 265, 131 Ct.Cl. 593, 610, certiorari denied United States v. Otoe and Missouria Tribe, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755. We are of the opinion that the only significance of the words in clause (4) "without the payment for such lands of compensation agreed to by the claimant" is that where the Indians have ceded land pursuant to a *ratified* treaty and have received the compensation which they had agreed to in that ratified treaty, no claim arises under clause (4). In such a situation, however, the claimant might have a claim under clauses (3) or (5), inasmuch as clause (3) gives the Commission jurisdiction to go behind *ratified* treaties and revise them for fraud, duress, etc., and in clause (5) the Commission is given jurisdiction to entertain claims based upon fair and honorable dealings. In a case where land held by Indian title is appropriated by the United States under an *unratified* treaty, and the Indians were paid a sum less than the market value of the land, they are not barred from claiming such market value even though the amount paid was the amount stipulated in the *unratified* treaty. This is so because an *unratified* treaty is not, of course, binding on either party. In the instant case, the lands which are the basis of appellants' claim were held by virtue of Indian or aboriginal occupancy title, i.e., they were lands "occupied by the claimant." Those lands were taken, not as the result of a treaty of cession, but "otherwise" without any treaty. Furthermore, there was no payment to claimants for such lands. Accordingly, appellants' claim would seem to fall squarely within the coverage of clause (4).

■ The Commission has held that the proof before it was insufficient to establish that the plaintiffs bringing suit were the descendants of the Upper and Lower Chehalis tribes. Section 10 of the Indian Claims Commission Act provides as follows:

"Any claim within the provisions of this Act may be presented to the Commission by any member of an Indian tribe, band, or other identifiable group of Indians as the representative of all its members; but wherever any tribal organization exists, recognized by the Secretary of the Interior as having authority to represent such tribe, band, or group, such organization shall be accorded the exclusive privilege of representing such Indians, unless fraud, collusion, or laches on the part of such organization be shown to the satisfaction of the Commission."

All the groups covered in the evidence are named parties plaintiffs and individuals are named as their representatives. Under section 10 above, an identifiable group of Indians may be represented by an individual as a representative of all the members of the group. It would therefore appear that the Indian groups having a cause of action would be adequately represented for the purpose of bringing this action through the representation of one of their members. If there is some doubt as to the identity of the Indians entitled to share in the judgment, if any, such a problem would appear to be administrative.

On the basis of the record as a whole, we are of the opinion that the findings of the Commission do not adequately reflect such record; that the ultimate findings adverse to appellants on the matters of identifiable group and land use and occupancy, are not supported by substantial evidence. The case is remanded to the Commission for further proceedings not inconsistent with this opinion.

It is so ordered.