Dureee, Judge,
delivered the opinion of the court:
The Confederated Tribes of the Warm Springs Reservation of Oregon are appealing two interlocutory orders of the Indian Claims Commission determining the area to which the tribes had either “recognized” or “Indian title.” [1] This appeal is taken pursuant to § 20 of the Indian Claims Commission Act of August 13, 1946 (60 Stat. 1049), as amended by the Act of September 8,1960. (25 U.S.C. § 70s(b).
On June 10, 1960, the Commission issued its findings of fact, opinion, and interlocutory order with regard to appellant’s claim of title to certain land in north central Oregon, within the area ceded to the United States under the Treaty of June 25,1855 (12 Stat. 963,2 Kappler 714) .[2] Appellant’s motion for rehearing was denied on October 10,1963. However, at the same time the Commission set aside its findings, opinion, and interlocutory order of 1960. A new order, together with new findings of fact, conclusions of law, and an opinion in support thereof was entered (12 Ind. Cl. Comm. 664) and substituted for the 1960 order (8 Ind. Cl. Comm. 557). The second decision was less favorable to the Indians than the first in that the land award was reduced from *190 roughly thirty-one percent of the area claimed by appellant to approximately twenty-one percent.*
I
The Indian Claims Commission Act provides that “The Commission shall have power to establish its own rules of procedure.” 25 U.S.C. § 70h. Eule 33 of its Eules of Procedure refers to motions for rehearings and for amending findings; it allows either party to move for such reconsideration within thirty days after the final determination of the Commission. 25 C.F.E. § 503.33 (a). This rule does not expressly give the Commission the power, on its own initiative, to order rehearings, reconsider, or modify its decisions.[3]
Notwithstanding its lack of statutory authority, the Commission possesses the right of reconsideration and modification. This right arises by necessary implication from its need to serve the purposes of its enabling statutes. The power of revision, so as to correctly serve its function, has been held to be of the very nature of an administrative agency. Cf., Helvering v. Continental Oil Co., 68 F. 2d 750, 753 (D.C. Cir. 1933), cert. den. 292 U.S. 627 (1934); Dayley v. United States, 169 Ct. Cl. 305, 308 (1965) ; Handlon v. Town of Belleville, 4 N.J. 99, 71 A2d. 624 (1950); Anchor Cas. Co. v. Bongards Co-op. Creamery Assoc., 253 Minn. 101, 91 N.W. 2d 122 (1958) .[4] Although this procedure is necessary to allow an agency to correct errors in its decision that go unnoticed by the parties, it has not existed without criticism. Objections to the non-statutory right of reconsideration center on the fear that this right could become a freewheeling legal device lacking any limitations on its usage.
Limitations on this right are requisite and should be .aimed at resolving the conflict between the desirability for finality *191 and tbe public.interest in reaching what.appears to be the correct result. Civil Aero. Bd. v. Delta Air Lines, 367 U.S. 316 (1961), at p. 321: ■
“Re-examination and reconsideration are among the normal processes of intelligent living. Admittedly-no warranty of correctness or fitness attaches to a decision or an action simply because it is a thing of the past. Every-day experience teaches the contrary: while the choice first made may well remain the cause ultimately followed, often enough it is found on further consideration to require revision. On the-other hand, constant re-examination and endless vacillation may -become ludicrous, self-defeating, and even oppressive. Whether for , better or for worse so far as the merits of the chosen course are concerned, a point may be reached at which the die needs to be cast with some ‘finality.’ Anopposi-' tion may thus develop between the right result and the final one.” At footnote 5 quoting Tobias, “Administrative Reconsideration — Some Recent Developments in New York,” 28 NYU Law Rev. 1262 (1953).
The quest for finality is evidenced by the time limits within which a motion for rehearing and reconsideration must be made. These periods range from five days (Fed. Rules of Crim. Procedure, Rule 33) ■ to thirty days (Ct: of Claims Rules of Procedure, Rule 68) in the Federal courts. In the absence of a specific period, this action must commence within a reasonable time; “Thirty, or perhaps sixty, days is the order of magnitude — -unless a special need for a longer period is shown.” Langenfelder & Son, Inc. v. United States, 169 Ct. Cl. 465, 473, 341 F. 2d 600 (1965). These time limits have been established to set a period within which the parties must decide whether or not they wish to avail themselves any longer of the jurisdiction of that particular court or .administrative agency. This prevents a judicial or quasi-judicial body from reaching out, after a case has left its jurisdiction, and pulling it back in by modifying or reconsidering its decision. This approach is especially dangerous if there has been reliance on the assumed finality of the decision. For example, the Indian Claims Commission allows either party ten days to request a rehearing. Assume that, the time allowed for the Commission to act on its own initiative is the *192 same. If the ten days passed and no one had moved for reconsideration, as far as the Commission would be concerned, its judgment would be final and it had been divested of jurisdiction over the case. Any further action by the Commission would only vitiate the degree of finality which the parties had attached to the decision.
Such is not the case here. When the Commission modified its 1960 decision, the initial determination had not passed beyond its control. For an administrative order is not final for the purposes of judicial review until outstanding motions for reconsideration have been disposed cf. Outland v. Civil Aero. Bd., 284 F.2d 224 (D.C. Cir. 1960). Due to the appellant’s motion for rehearing which kept the case within the jurisdiction of the Commission, the concern of finality did not arise. The only interest that had then to be served was the quest for the right result.
The need for the Commission to reach the right result is obvious. In support of an administrative agency’s right to revise on its own initiative, one court has stated: “If upon deeper research, fuller reflection and consideration, the judicial or quasi-judicial body would see a mistake but persist in it, this would amount to mere obstinacy or stubborness and foster the highest form of injustice.” Shein v. United States, 102 F. Supp. 320, 323 (1951), aff'd 343 U.S. 944 (1952).[5] See also Continental Casualty Co. v. Amer. Fidelity & Cos. Co., 186 F. Supp. 173, 178-180 (1959); 3 Barron & Holtzoff § 1306 (Supp. p. 1778) Preliminary Draft of Proposed Amendment to FRCP § 59 (b).
In considering the Commission’s method of reconsideration, our function is not to select the method we would use, but to determine if there has been an abuse of discretion or a clear failure to exercise discretion. Once a rational basis for the 1963 action on reconsideration has been found, the judicial function ends. United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 535 (1946); Lang Transp. Corp. v. United States, 75 F. Supp. 915 (1948); Cia Mexicana De *193 Gas v. Fed. Pwr. Comm. 167 F.2d 804 (5th Cir. 1948); APA § 10(e), 5 U.S.C.§ 1009(c).
In summary, this court holds: (1) the Commission has the right, on its own initiative, to order rehearings, and reconsider or modify its decisions; (2) when neither of the parties has moved for a rehearing, the Commission should be required to act on its own initiative within a reasonable time after its decision; (3) when one of the parties has moved under Ind. Cl. Comm. Bules of Proc. § 33(a), the Commission may reconsider its decision until it acts on the motion. This approach means that the parties, by their actions, shall determine the period in which the Commission may reconsider. This solves both the problems of finality and fairness, and is in accord with the idea that “* * * administrative procedure is, and should be, simpler, less formal and less technical than judicial procedure. Certainly it should not be made more so in the absence of clear and specific mandate from Congress.” Sherwood Bros. Inc. v. District of Columbia, 113 F. 2d 162, 165 (D.C. Cir. 1940).
In upholding the Commission’s right to enter its 1963 decision, we hold that the Commission’s order of June 10,1960 has been vacated and replaced by the order of October 10, 1963. Since a vacated judgment becomes nonexistent, it is not subject to appeal; therefore, we will only consider the appeal from the 1963 order of the Commission. Glen Falls Indemnity Co. v. American Seatinq Co., 248 F. 2d 846 (9th Cir. 1957).
II
The Commission found that “[t]he United States has never recognized title to the tract of land ceded by the Treaty of June 25,1855, or any part thereof, to belong to any one or all of the several Indian band entities which executed that treaty, or the confederation created by it.” 12 Ind. Cl. Comm. 664, 678. The Commission did find that the appellant held “Indian title” to seven separate but contiguous tracts of land on the south side of the Columbia Biver. Ibid at 708-710. Appellant does not appeal the denial of “recognized title”; only the determination of its “Indian title” claims is before this court.
*194 Tbe fact, that the was description of the land ceded to the United States in the treaty of 1855 is not by itself.sufficient'proof that the appellant had “Indian title” to the. land. Red Lake, Pembina, and White Earth Bands v. United States, 164 Ct. Cl. 389 (1964). There must be a showing • of ■ actual, exclusive[6] and; continuous-use and occupancy .“for a, long,, time” prior to the loss of the land. . Sac and Pox Tribe of Indians of Oklahoma v. United States, 161 Ct. Cl. 189, 315 F. 2d 896, cert. den. 375 U.S. 921 (1963) Snake or Piute Indians v. United States, 125 Ct. Cl. 241, 112 F. Supp. 543. (1953); The Quapaw Tribe of Indians v. United. States, 128 Ct. Cl. 45, 120 F. Supp. 283 (1954); Alcea Band of Tillamooks v. United States, 103 Ct. Cl. 494, 59 F. Supp. 934 (1945), aff'd 329 U.S. 40 (1946); Six Nations v. United States, 173 Ct. Cl. 899 (1965). See also Federal Indian Law 18-20, 591, 593-601, 645, 676. “Continuous” use does not limit -recovery to areas where . the ■ tribe had permanent ■ villages, but-also includes seasonal or hunting areas over which the Indians had control even though those areas were used ;only intermittently. Spokane Tribe v. United States, 163 Ct. Cl. 58, 66 (1963); Delaware Tribe of Indians v. United States, 130 Ct. Cl. 782, 128 F. Supp. 391 (1955); Iowa Tribe v. United States, 6 Ind. Cl. Comm. 464 (1958). The time requirement, as, a. general rule, cannot be -fixed at a specific number of years. It must be long enough to have allowed the Indians to transform the area into domestic territory so as not to make the Claims Commission Act “an engine for creating aboriginal title in a tribe which itself played the role of conqueror but a few years before.’? Sac and Fox Tribe, supra, at 206. See also Confederated Tribes of the Umatilla Indian Reservation v. United States, 14 Ind. Cl. Comm. 14, 117-118 (1964).
The Commission held that'the appellants had such “Indian title” to land on the south side of the Columbia5River which is 'included in the arda circumscribed by a line drawn .as follows-:
Commencing at the junction-of the Multnomah-Hood / River county lines on the Columbia River, thence south- - erly along the Multnomah-Hood'River County finé to *195 tile southeast corner of Multnomah. County; 'thence : southeast on a line to the town of Maupin, in ■'Wasco County; thence northeast .on .a line across the John .Day-River to the southeast corner of Township 3 South, Range 20 East in Gilliam Comity; thence north oil 'the range line between Ranges 20 and 21 East to its intersection with the Willamette Base Line; thence northeast-on- • a line to the Columbia River passing through the town of Blalock in Gilliam County. 12 ICC 664, 109.
' The land claimed extends from the Cascades to the eastern edge of the drainage of- the lower John. "Day River .in1 its east-west boundaries. From the Columbia ¡River ■ on- the north the .area runs southward to South Sister Mountain, on the southwest and to' the western spur of the Blue Mountains-on the southeast. ■ The northwest area was Occupied by the Wascoes bands; all the rest by Wayampam bands. Seefoot-note 2.- Except for a small area north and east of Mount Hood, the area not recognized by the Commission was claimed for the Wayampam. In fact; only the Wayampam'bound-ary lines as determined by the Commission have beeh appealed to "this court. This =deoisionp then -need only concern itself with the lines running from near Lookout Mountain.-to Maupin; then to the southeast corner of Township 3 South, Range 20 East in Gilliam County; then north to the Willamette Base Line; then northeast through Blalock.
In our review of the Commission’s boundary findings, we do not determine whether we -would have decided the issues the same way had the case been argued de novo: Six Nations v. United States, 173 Ct. Cl. 899 (1965); Instead,- our inquiry concerns whether or not the Commission’s decision is supported by substantial evidence. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 487-88 (1951); Yakima Tribe v. United States, 158 Ct. Cl. 672 (1962); Snake or Piute Indians v. United States, 125 Ct. Cl. 241, 112 F. Supp. 543 (1953); United States v. Seminole Nation, 146 Ct. Cl. 171, 173 F. Supp. 784 (1959); Kiowa, Comanche and Apache Tribes v. United States, 143 Ct. Cl. 534, 163 F. Supp. 603 (1958); Nooksack Tribe of Indians v. United States, 162 Ct. Cl. 712 (1963), cert. den. 375 U.S. 993 (1964); Miami Tribe of Oklahoma v. United States, 146 Ct. Cl. 421, 175 F. Supp. 926 (1959). See also Davis, *196 Administrative Law Text, §§29.02-29.06 (1959), Administrative Proc. Act, 5 U.S.C. § 1009 (e), Ind. Cl. Comm. Act (25 U.S.C. § 70s).[7] In deciding upon the substantiality of the findings, we must consider the record in toto and not only the case presented by one party. Universal Camera Corp., supra; Osage Nation of Indians v. United States, 119 Ct. Cl. 592, 97 F. Supp. 381, cert. den. 342 U.S. 896 (1951); Spokane Tribe v. United States, 163 Ct. Cl. 58 (1963); Miami Tribe of Oklahoma v. United States, 150 Ct. Cl. 725, 281 F. 2d 202 (1960), cert. den. 366 U.S. 924 (1961). “The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole.” Williams v. United States, 130 Ct. Cl. 435, 441, 127 F. Supp. 617, cert. den. 349 U.S. 938 (1955). See also Jaffe, “Administrative Procedure Re-examined: The Benjamin Report,” 56 Harv. Law Rev. 704, 733 (1943) ; Sen. Doc. No. 248,79th Cong. 2d Sess. 214,280 (1946).
What is meant by “substantial evidence” is about as clear and at the same time about as vague as it can be without constricting this court within rigid precepts.[8] We avoid a substitution of judgment and thereby avoid too much review. Concomitantly, we avoid too little review and do not pass favorably on a decision supported by any isolated evidence. Any further attempt to spell out our meaning of the concept would be to no avail “* * * [s]ince the precise way in which courts interfere with agency findings cannot be imprisoned within any form of words, new formulas attempting to rephrase the old are not likely to be more helpful than the old.” Universal Camera Corp., supra, at 489.[9]
*197 Within this judicial review framework, we now consider each of the disputed boundary lines separately. This task requires an analysis of the broad spectrum of opinions as to each boundary.
The eastern border. — This is the line running from the southeast corner of Township 3 South, Range 20 East in Gilliam County, north to the Willamette Base Line and then continuing north through Blalock. Dr. Verne F. Ray, the appellant’s expert witness before the Commission, is the only anthropologist who has done intensive ethnological field work with both the Wayampam and the Umatilla, the tribe adjoining the John Day River band, who were the most eastern group of Wayampams. He divided the common-use land from the John Day River east to Willow Creek between the two tribes and placed the territorial boundary at the watershed divide of these two streams. A Wayampam[10] village site was located by Dr. Ray on the Columbia River near Arlington, Oregon.[11] Robert Suphan, an expert witness for the appellee, specified no eastern limits, although his “primary subsistence” map suggests a line running south from Arlington. Joel V. Berreman, an anthropologist, published a map of tribal distributions as of 1850 which showed the Wayampam eastern boundary east of Rock Creek and the lower John Day River. The Wayampam territory adjoined the Umatillas’ land near Arlington, Oregon according to Dr. George Murdock. Agent A. P. Dennison, in 1857, reported the John Day River band in the immediate vicinity of that river. This general statement by a man who had only been in the area a short time is the only evidence in conflict with the experts’ opinions. And there is some question whether a conflict actually exists. On the strength of these facts, we hold that the Commission’s finding regarding the eastern boundary is not supported by substantial evidence.
The southern border. — This is the line running from near Lookout Mountain to Maupin and then to the southeast *198 corner of Township 3 South, Range 20 East in- Gilliam County. The-claimed land south of the awarded area was found by the Commission to have 'been wandered, traveled, limited, fished and fought over not only by the Wayampam, but also by-the Snake[12] Indians during-the’first half of the nineteenth century. ’ Even-where the Commission found that the Snakes had been expelled from the area, the Wayampam occupation was-held to be of-such recent character that it had not yet ripened into “Indian title”.[13] 12 Ind. Cl. Comm, no, 730-731,734, 785-738, 739-740.
Only the'extént and the time of the Snake use of this area is in review since sufficient evidence does not exist to-show-that this usage was on'a '“guest-host” basis. See footnote 6. Even though the Wayampam were basically pácifistic, their attitude toward the Snakes' belied this characteristic. The Snakes'were regarded as savages undeserving the treatment accorded the- Indians in the Sahaptin region to-the north. On occasions the Wayampam took Snake women and children as prisoners, and sold them as slaves at their trade marts-on the Columbia River. The nature of the Snake culture -fostered such animosity. Their wandering-way of life led them into any -area where they thought they could obtain something to eat or to use in their meager existence. -This mode of living-resulted from the condition: of their land which was less productive, and-had less'rainfall than that of -their neighbors’. ■--■■■- -
‘ Evidence supporting Snake and Wayampam use and occupancy of the claimed area came from expert witnesses in the fields of ethnology and anthropology,-accounts of traders and hunterS'of-this nineteenth century era, descendants of members of the treaty tribes, and post-treaty-of-Í8'65' documents and materials. - 1-
Expert witnesses:- — Dr. Verne Ray, from whose evidence the claim for the entire tract'is made, attempted in his research to uncover how the Wayampam utilized their territory *199 by cr.oss-checking the various, statements of, his informants against each other and other knowledge , of the tribe. He listed and mapped the use made of over eighty specific permanent locations. His work dates the Wayampam drive, to push opt the Snakes, from 175 Q. ,< By 1790, this1' movement reached its. peak so that the Wayampam, in his opinion,; were in full control of the entire area by 1810, The presence of Snakes between 1810 and 1855 is explained away ,on the ground .that their entry was nothing more than that of marauding bands venturing into a vacuum created when the Wascoes and Way-ampam traveled into .the, area of the Warm Springs Reserva-; tion. Hr..Ray believes that the Snakes were 'cognizant'of Wayampam.ownership of, the area, and of the fact that,they were, entering it without right. .-, , , .... ■
. Robert Suphan based his opinions on six months of library research, and three months of field work spent inter r viewing, descendants of treaty Indians, but not locating the. various Wayampam villages.[14] = He placed the Wayampam within “primary, subsistence areas” which are his portrayal of the Wayampam aboriginal boundaries.: He-mapped the Wayampam territory ,as including land south to about. Sha-, niko, and then on, to a point south of Glarno, since he found that the Wayampam occupied this, land, just' prior to the treaty of 1855. If.the Snake, had previously occupied the, land, they had been driven out byJ treaty -time.; - As, for the area beyond, Clarno, Suphan found no information -on Way-ampam usage except for the location of two -villages; on the John Day River or,the use pf some-of this land-for huntings To the, west of this aboye .area, Suphan .stated-that historical sources bore out the contention that the Wayampam went as far south as the.Metolius. River for fishing; to Black Butte for roots, berries, and nuts; and to the Three Sisters Area for game. Even though the Wayampam: used this country south of the Mutton Mountains, he believed that they did not dp so exclusively. , ,, , s , ... &
The Snakes were located on the Seekseekwa Creek, Metolius River, and perhaps - elsewhere within the- Warm *200 Springs Reservation area, which Suphan found to primarily belong to them inasmuch as the Snakes had summer and winter camps along Seekseekwa Creek and about Bend, Prineville and Madras. The area about Mount Jefferson, Ollalie, Butte, and the region between Tygh Valley and Sherar’s Bridge south to Seekseekwa Creek was labeled jointly exploited territory.
Dr. George Murdock, who made a study of the Wayampam in 1934 and 1935, believed that the entire area of the present Warm Springs Reservation had been Snake territory from time immemorial, and that the Wayampam expanding to the south and southeast from the Columbia River exerted pressure upon the tribes in the area which reached its height in the years between 1810 and 1855. His interpretation divides the aboriginal history of this area into three periods, — prior to 1810,1810-1820, and post-1820. Prior to 1810, the southern neighbors of the Wayampam were the Molala who had a winter village near Tygh Valley and moved every spring to a fishing village at Sherar’s Bridge on the Deschutes. South of the Molala were the Snakes. Between 1810 and 1820, the Molala were driven from their villages at Tygh Valley and Sherar’s Bridge by the southern expansion of the Wayam-pam.[15] After this period, the Wayampam continued to expand, going further and further into Snake territory so that by the time of the establishment of the Warm Springs Reservation, they had displaced the Snakes from the berrying grounds near Ollalie, Butte and Mount Jefferson, from root-gathering grounds around Shaniko, and from the entire John Day River Valley almost as far south as the great bend of that river.
Other experts whose work was given some consideration were:
Ralph Shane, who said that:
The Warm Springs Reservation was created by the Treaty of 1855. The Reservation area had not been per *201 manently inhabited by any tribe or band of Indians prior to that date.[16]
***** At the time that the Treaty of 1855 was drawn, all of the Indians of the Confederated Tribes and Bands of Middle Oregon were residing in the area near the Dalles and largely along the Columbia River.[17]
James Teit. — His hypothesis was that the Snakes never were the original owners of the area in question. He postulated a northward movement by the Snakes in 1800-1830 which had the effect of driving the Molala Indians from the Deschutes Valley into the Willamette Valley across the Cascades, and of driving the Wayampam from a former central Oregon home northward to the Columbia River. Objections to this theory have been voiced by Ray, Suphan and Murdock on the ground that neither traditions nor linguistic distributions substantiate this view of northward Snake expansion.
James Mooney. — His work states that the Wayampam conquered the present Warm' Springs Reservation from the Snakes; that this expulsion was in full progress when Lewis and Clark went down the Columbia in 1805, but had not been entirely completed when the first treaties were made with these tribes fifty years later.
Horatio Hale. — In explaining the locations of Wayampam villages which were all near the Columbia River except for those at Tygh Valley and Sherar’s Bridge, Hale found that the tribe also made use of great expanses of territory beyond such villages, as they moved from one root ground to another as different species came to maturity.
Omer O. Stewart. — He located the Snake country north along the eastern side of the Deschutes River to about opposite the big bend in the John Day River.
In evaluating this expert evidence, this court does not merely count heads and reach its decision on the expertise of these men by finding out which view has the greater number of advocates. A man’s experience both in ethnological *202 studies generally, and in studying tiie Indians of tbis area is considered, SpoTcane Tribe, supra, at p. 65, as is the opinion of his intellectual peers of his work.[18]
Oonhemporary accounts. — These accounts often' speak in general terms inasmuch , as their compilers were seldom versed in geography (they also speak with inexactitude on the nature of the use and occupancy by thei various tribes. Nevertheless, these records are to be given some weight in determining.“Indian title” due to their help in locating tribal encampments and in understanding other evidence. ' '
: The .journals kept by Meriwether Lewis and.William'Clark and others of their party give first-hand .reports as of 1805 and 1806 .oh the .topography of the Columbia River area, and on the idehtities of the Indians living nearby. .Théir journals discíoáé that iiíí805, the'Wáyámpam were residing'along the northern side of the Columbia River, and doing some hunting as far south as Sherar’s Bridge and the northern part of the Tygh Valley. The reason that the Wayampam did not live more extensively on the south side of the river was attributed to' fear .of a. Shake' attack.' These entries left unresolved whether the Shakes actually dominated this section of Oregon as far north as the Columbia all year, or just during their warring periods. Lewis and Clark did locate a, northern location of the Snakes at the ‘(falls of' Towarnehiooks”, but legitimate controversy still 'exists .whether this reference is to Sherar’s Bridge of to the more s'outhernly Cline Falls,[19]
Robert Stuart and Alexander RosS (employees of the Pacific Fur Co.) initially passed through this disputed part of Oregon around 1811-1812. Stuart reported two Indian villages on the south side of the Columbia between The Dalles and Celilo Falls. Ross, while in the vicinity of Celilo Falls, *203 found .the banks ■ of the Columbia lined with Indians,, and came upon a large camp on. the south side of the river near the mouth of the Deschutes River. . A decade later, he. prepared a map of the Columbia, showing Indian villages.on the south- bank at The Dalles, at Celilo Falls, on- both sides of the Deschutes near its mouth, and also a short distance up. that stream on the east side. ,. . ,,
In 1825, Peter Skene Ogden, a Hudson’s Bay Co. trader, reported coming across forty huts which,he considered, structures of the Snake Indians in the Deschutes-Crooked River country. The exact location of these huts is open to dispute; some authorities have placed them-, as far south as forty air miles-from the Mutton Mountains. A -decade after Ogden, Nathaniel Wyeth? an. early Oregon pioneer; and, fur trapper,, found Walla Wallas (but not necessarily. Wayam-pam) .and. Snakes near the confluence of the Deschutes and Crooked Rivers., In this same general area, Wyeth also came upon twelve, lodges of Walla Wallas, and a few miles, further south, three lodges of Snakes. George Simpson,. another Hudson’s Bay Co. employee, .after traveling up and down the Columbia, located Wayampam bands on the south side of., the river. The Snakes were also located in the. Warm Springs Reservation area on the Deschutes, and on the eastern bank, of the middle Deschutes;, the former by Indian agent Nathan Olney; the latter by John C. Fremont. •: j . Brevet Major. G. O. Haller,the field .commander of the 4th Infantry, stationed at The Dalles of the Columbia, made a “Map Exhibiting fbe Location of the .Indians in the Utilla Agency, District and, the Oregon Indians .South.” ■: This map which was transmitted by Indian Agent , R. R. Thompson .to Joel Palmer, Superintendent of Indian Affairs for the Oregon Territory, along with his annual report of 185,4, excluded the Snakes from all land claimed by the appellant. The intention of the author. of;the map is unknown; that is to say, it is, still, open tq debate, whether he intended .to designate specific boundaries for the tract or to only give the Superintendent a . general idea of where the various tribes within the area were, located. Another- map whose apcuracy has not been conceded is the Palmer-Belden map of 1855, , It shows *204 Snake or Shoshone Indians located inside the southern boundary of the area ceded by the Treaty of 1855, but its hazy topography makes a determination of how far inside quite difficult.
Indian informants. — Oral testimony of Indians who were descendants of members of the tribe who had actual knowledge of the extent of the use and occupancy of the land claimed by the tribe, which knowledge had been passed on by word of mouth, is entitled to some weight, and is not to be deemed worthless, particularly when it is corroborated by documents and the testimony of others. Pueblo de Zia v. United States, 165 Ct. Cl. 501 (1964). The importance of corroboration and cross-checking cannot be undervalued since informants can mislead researchers by describing some period (usually the reservation one) besides the aboriginal, pre-treaty period. Nay, “Native Villages and Groupings of the Columbia Basin” in 27 Pacific Northwest Quarterly, 99-152 (1936). See .also Confederated Tribes of Umatilla Indian Reservation v. United States, 14 Ind. Cl. Comm. 125 (1964).
While Dr. Murdock was working among the Wayampam in 1934-1935, an informant told him that between 1810 and 1820, the time that the Wayampam expelled the Molala from the Tygh Valley, the Snakes held the Warm Springs Neser-vation area to the south of Tygh Valley, used the berry grounds around Mount Jefferson and OUalie, wintered on Seekseekwa Creek, and exploited the root grounds around Shaniko. In the first part of the twentieth century, while pursuing field work in the vicinity, Edward C. Curtis was told by an Indian informant that the Snakes used to lay in wait to kill the Indians digging roots in the hills south of the Columbia Niver, and that about 1815, a war party of Wascoes, Wayampam, and others went up the Deschutes Niver, destroying a large Snake camp on a tributary of that river, and while enroute home, came upon another Snake camp on the Warm Springs Niver which they pillaged.
Post-treaty material. — Materials and documents of the post-18'55 era can be used to shed light on the state of affairs prior to the treaty, and may indicate whether or not the tribe used and occupied the land claimed to have been owned *205 by “Indian, title.” The weight accorded such evidence depends upon its closeness in time to the critical dates, see Sac and Fox Tribe of Indians of Oklahoma, v. United States, 161 Ct. Cl. 189, 315 F. 2d 896, cert. den. 375 U.S. 921 (1963), and the degree of its anomaly within the period.
In 1860, Edward Geary, Superintendent of Indian Affairs for the Oregon Territory, explained the hostility of the Snakes toward those on the Warm Springs Reservation as resulting from having the reservation lie within the limits of the territory not only claimed by the Snakes, but also admitted by the Indians, parties to the treaty, to belong to them. The Snakes, seeing themselves as the true and original owners, claimed that the Government had no right to give to their enemies their favorite hunting grounds without consulting them. Agent A. P. Dennison reported in 1857 the Tygh and Wyam Bands of Wayampam, residing no further south than the Commission determined their areas to be; in 1859, he reported Snakes camped on the Crooked River, and on the east side of the Deschutes opposite the Warm Springs Reservation. Post-treaty raids have also been interpreted not as evidence that the Snakes occupied or used this land prior to 1855, but only as a temporary phenomenon of new and rapidly changing conditions in the Snake culture; namely, their acquisition of firearms, and the use of the horse for locomotion coupled with the vacuum created in most of the country south of the Columbia River during the Indian war between the Government and the treaty tribes.
This court has noted in the past the difficulties in determining the exact boundaries of land held by “Indian title”, and has stated that reasonable accuracy is sufficient. This has led to the approval of Commission decisions which delineated “Indian title” boundaries by straight lines, as has been done in this case. Upper Chehalis Tribe v. United States, 140 Ct. Cl. 192, 195, 155 F. Supp. 226 (1957) citing, inter alia Nooksack Tribe v. United States, 3 Ind. Cl. Comm. 479, 489 (1955) ; Muckleshoot Tribe of Indians v. United States, 3 Ind. Cl. Comm. 658, 665-666 (1955). Making allowance for this situation, this court holds that there is substantial evidence on Snake usage of the claimed land to support the Commission’s southern boundary determination.
*206 The opinion of the Commission suggests that its boundary-determinations-were influéncecbby a consideration in addition to those of inconsistent use by the Snakes,- and too'short -a period of Wayampam occupation. Namely; the Commission hints at a denial of land because of its usage as a common •subsistence-"area by moré than-one .baiid of Indians: See 12 Ind. Cl. Comm. 664, 710 -711, 720-723, 727.
- To prevent recovery fon-all tlié lands claimed tcv be-used collectively by the- Wayampam,' thére must-¡be substantial evidence 'that, the various Wayampam bands not only did not constitute a single political' unit,, but also That they weremot an identifiable «group or tribe, in The ethnic «or cultural sense. Muckleshoot Tribe of Indians ex rel. Ross, v. United States, 3 Ind. Cl. Comm. 658, 675. In Muckleshoot, <iMe¡ Commission .stated:: -■•: • -- T ;■ - . ':
•■■*'■** It'appears'to this Commission That'to deny the «Muckleshoot Tribe the right-to-recover for lands occu- ' pied by The villages.whose.people were so closely asso-dated economically and culturally on the grounds of lack of political cohesion would be to misconstrue the benefi- ' cent 'purpose of Congress[20] in'enacting the legislation under which this claim is maintained. Ibid, footnote ■ added. . « • - ■ '■ . ? .
This doctrinó has béen followéd by the Commission in Lummi Tribe v. United States, 5 Ind. Cl. Comm. 525, 546;[21] Northern Paiute v. United States, 7 Ind. Cl. Comm. 322, 415-416; Hualapai Tribe v. United States, 11 Ind. Cl. Comm. 458, 474.[22] And" it hás béen affirmed by' this court in Upper Chehalis Tribe v. United States, 140 Ct. Cl. 192, 155 F. Supp. 226 (1957).
*207 All Wayampam were of-the Sahaptin linguistic stock and spoke the Walla Walla language, more specifically'the Tenino dialect. -There was no feeling of strangeness among the sub-tribes,-befit in their culinary habits or their religious practices. -They all had common allegiances,- privileges, and duties and all sub-tribe members had complete freedom in the economic utilization of any part of the Wayampam territory. ■ Other tribes treated the various Indians as Wayam-pam, and not as members of the sub-tribes. Dr; Ray classified them as: one tribe; and mapped their territory one area without internal boundaries. Thus, except for - political unity-(which the above cases do not require), the Wayam-pam were strongly united. And in- the post-treaty period, they even obtained' a degree of political imity when the Wayantpam joined forces-under Wyam Chief-Stocketly in the Indian wars of 1858-1857. - Notwithstanding their apparent denial of claimed-land on common usage grounds, the Commission seems to admit this cultural unity1 -of-the Wayampam. 12 Ind. Cl. Comm. 664, at 685-687.
Thus, we hold that there is not substantial evidence to support a finding that the Wayampam were anything but culturally unified, and a boundary determination, drawn from such a finding cannot be affirmed. ,,
in
?’ Our task has not been the determination of ‘where tlié preponderance of the evidence-lies; -this court does not weigh the evidence independently, but merely examines it to see if there is substantial-evidence in the entire record to sustain the Commission’s ■ findings. Sao and Fox Tribe v. United States, supra. And once we conclude that there is Substantial evidence^ we stop. ' Our imprimatur is one of reasonableness, ■notrightness.[23] --
■ Questions of interpretation; dharaoterizationSj or evidence weighing are outside our scope of review. This court may not substitute its judgment on thesematters for that of- the *208 Commission. The actual confrontation of the witnesses by the triers of fact precludes our review of inferences unless there is uncontrovertible evidence or physical fact which contradicts the inferences. FTC v. Pacific States Paper Trade Ass'n., 273 U.S. 52, 63 (1927); Corn Products Refilling Co. v. FTC, 324 U.S. 726, 739 (1945); Miami Tribe of Oklahoma v. United States, 150 Ct. Cl. 725, 281 F. 2d 202 (1960), cert. denied 366 U.S. 924 (1961); Spokane Tribe v. United States, supra. And where there is evidence to support either of two fairly conflicting views, this court is not free to set one of them aside, even though the Commission could have drawn the other and been supported by substantial evidence. National Labor Relations Board v. Nevada Consolidated Copper Corp., 316 U.S. 105 (1942); Radio Officers' Union v. National Labor Relations Board, 347 U.S. 17, 48-49 (1954); National Labor Relations Boards. Walton Mfg. Co., 369 U.S. 404, 405 (1962); Yankton Sioux Tribe v. United States, 175 Ct. Cl. 564 (1966).
IY
When this court finds error in the decisions of the Indian Claims Commission, it remands the case to the Commission unless there can only be one answer to the issue in question. If there is room to choose, remand follows to allow the special competence of the agency to function. Spokane Tribe, supra, at p. 70. Osage Nation v. United States, 119 Ct. Cl. 592, 97 F. Supp. 381, cert. den. 342 U.S. 896 (1951); Pawnee Indian Tribe of Oklahoma v. United States, 124 Ct. Cl. 324, 109 F. Supp. 860 (1953) ; Snake or Piute Indians v. United States, 125 Ct. Cl. 241, 112 F. Supp. 543 (1953); Miami Tribe of Oklahoma v. United States, 146 Ct. Cl. 421, 175 F. Supp. 926 (1959) [24] With regard to the eastern boundary, we hold that the evidence requires that it be drawn from an area near Arlington on the Columbia River. The issue of its southern extension and connection with the southern bound *209 ary is to be remanded to -the Commission for a determination not inconsistent with, the evidence cited in this case, which requires Arlington to be the boundary’s terminus. With regard to the southern boundary, the Commission’s decision is unclear upon which findings its determination is based. Even though there is substantial evidence to support its decision on the southern boundary, this determination cannot be upheld since there exists grounds upon which its action cannot be sustained. Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 94-95 (1943). Therefore, we remand the issue to the Commission for a determination of the southern boundary not inconsistent with this opinion’s holding on the cultural unity of the Wayampam.
V
An amicus curiae has asked this court to rule on the Indian Claims Commission’s “sovereignty rule” if we find that the Wayampam had perfected “Indian title” as of 1855 (the date of the cession treaty), but not as of 1846 (the date of initial U.S. sovereignty). Since the selection of either date would not materially change the decision of this court, we make no determination on this issue.
VI
The Commission erred in entering finding No. 4,12 Ind. Cl. Comm. 664, 668, relating to an Indian claim for damages to and appropriation of certain fishing sites under the treaty of November 15, 1865. 14 Stat. 751, 2 Kappler 908. The appellee and the appellant agree that the finding should be vacated. But our decision rests not on the unanimity of the parties, but on the demand of the law. It is the intent of Congress that cases arising under the Indian Claims Commission Act should be decided on a complete and full record concerning all ascertainable facts. Pawnee Indian Tribe of Oklahoma v. United States, 124 Ct. Cl. 324, 109 F. Supp. 860 (1953). Decisions should not be made without a consideration of the record in question as the Commission seems to have done here inasmuch as, at the time of the Commission’s decision, the case involving the 1865 treaty was still before it.
*210 The Commission allowed the appellant to recover not ,as the successor in interest to, but on behalf, of, thé tribal entities signatory 'to the treaty of 1855. Appellant was incorporated by áíl óf the Indians residing upon the Warm Springs Reservation; there was'no requirement’that,any member of this entity be able to trace bis ancestry, to the treaty bands of 1855, of the entity created by the treaty. ' In fact, the Confederated Tribés.of Warm Springs Reservation of Oregon does include a much wider range, of people than merely descendants of the treaty entities’; namely, whole blooded, or mixed blooded Paiutes. Thus, the Commission’s determination of the appellant’s capacity to sue is correct. Spokane, supra, at p. 72. Peoria Tribe of Indians v. United States, 169 Ct. Cl. 1009 (1965.); Minnesota Chippewa Tribe v. United States, 161 Ct. Cl. 258, 270-272, 315 F. 2d 906 (1963). See also, 25 U.S.C. §§ 70a aiid T0i.' To whose''benefit’ any award might inure is not decided by any phrasing bf the capacity to sué. Hów the award is to be paid and precisely who caii participate' in the award are' questions, not for this court or the Commission, but for Congressional'and administrative determination. Peoria Tribe, supra, at p. 1011. See also McCalib v. United States, 83 Ct. Cl. 79, 85 (1936).
'VIII
’ Conclusion. — This court holds the following: 1) the 196,3 Commission decision is the one properly before this court, 2) there is not substantial evidence to support the Commission’s eastern boundary ^termination, and we remand. determina: tion to the Commission for a redrawing of the boundary not inconsistent with this opinion, 3) there is substantial evidence to support the Comniission’s. southern boundary finding .with regard to Snake usage and length of Wayampam occupation, but there is not substantial evidence for their finding with regard to common usage; therefore, we remand this question to the Commission for any adjustment, necessary to make the *211 soutbern boundary determination consistent with our bold-ing, 4) the'amieW civriae question need not be decided in this case, 5) finding No. 4 is vacated, and 6) the Commission’s determination of .appellant’s capacity to sue is correct, and does not in any way allocate any award which might be ’ Reversed and Remanded

 By agreement of the parties, tire only issue tried before the Commission was the boundaries of the land the tribes owned by either form of title. Whether the consideration paid by the united States for the lands was fair or unconscionable was not determined and the issue is not before this court. The same is true as to whether or not the Government was fair and honorable in its dealings with the Indians. Also awaiting determination is the fair market value of the land belonging to the Indians at the time of the cession to the united States.

 The area ceded in the treaty is identified as Royce Area 369 in, Royce’s Map of Oregon I (18th Annual Report of the Bureau of American Ethnology— Part 2). The Indians named in the treaty were the Tygh, Wyarn, Tenino, and John Day River bands of Wayampam and the Dog River, Dalles, and Ki-gal-twalla bands of the Wascoes.

A map is appended to this opinion showing the boundaries determined by the Commission in 1960, in 1963, and those claimed by the appellants.

 This statutory right to change decisions has been given to other Federal administrative agencies as well as the district courts. See 49 U.S.C. § 17(7), Interstate Commerce Commission; 47 U.S.C. § 405, Federal Communications Commission; 15 U.S.C. §717(r), Federal Rower Commission; 29 U.S.C. § 160(d), National Labor Relations Board; FRCP § 59(d).

 But see Heap v. City of Los Angeles, 6 Cal. 2d 405, 57 P2d. 1323 (1936) ; Trigg v. Industrial Comm., 364 Ill. 581, 5 N.E. 2d 394 (1936).

 In Shein, ibid., the Interstate Commerce Commission in its Initial decision, was favorable to plaintiff, upon a motion for reconsideration by an inter-venor, the Commission, -without taking any new evidence, reconsidered and revised its earlier holding.

 Joint and amicable possession of tbe property by two or more tribes or groups will not defeat “Indian title.”

 The Indian Claims Commission Act, at 25 U.S.C. § 70s notes that this “Court shall determine whether the findings of fact of the Commission are supported by substantial evidence.”

 “Rigid formulas only place a court in an apparent straight jacket, and blind it and counsel to the real nature of the problem.” Kramer, “The Place and Function of Judicial Review in the Administrative Process.” 23 Ford-ham Law Rev. 1, 75 (1959).

 The “old formula” to which Universal Camera was referring is the requirement of a substantial basis of fact from which the fact in issue can be reasonably inferred; that is to say, that it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. NLRB v. Columbian Enameling 6 Stamping Co., 306 U.S. 292 (1939).

 To avoid confusion, tlie term “Wayampam” will be used in. place of the names of its various bands even though what is being referred to might have only concerned one particular band.

 This Wayampam-umatilla boundary was the result of Dr. Ray’s Umatilla “village list” which located the permanent or semipermanent occupation sites used during the annual round of the Indians. He later confirmed this with his completed work on the Wayampam.

The- Snake Indians referred to in this opinion are the same tribe as the Northern Paiute — the name used for them by - several anthropologists.

 The importance of the Snake presence, or absence in this southern area disallowed by the Commission rests on the fact that evidence of the northern limits of Snake usage is evidence of the southern, limits, of Wayampam “Indian title.” And the opinion of the Commission follows this line of reasoning.. ,.

 Suplían made extensive 'use' of the data On village locations foiind in an article published in 1938 by Dr. George P. Murdock in Tribal Distribution in Eastern Oregon and Adjacent Regions.

 The combined Wasce and Wayampam areas outlined by Dr. Murdock far this period, 1810-1820, are very similar to that described as held by “Indian title” in finding 50 of the 1963i decision. 12 Ind. Cl. Comm. 708 — '709.

 Shane, “Early Explorations Through Warm Springs Reservation Area.” Oregon Historical Quarterly (December, 1950), at p. 273.

 ma at p. 289.

 Bearing this, in miad, we. have" taken note of the fact .that Dr..Murdoch was one-time head of the Yale Anthropology Department; that "Dr. Ray' has been’a-professor at'the university-of Washington, and-that both men have done research on the Wayampam, prior to this action, without any litigation in mind. We take, noté also of Mr. Suphan’s qualifications — he does not hold a Phd. as do Murdock and Ray.' He'has not published extensively in the'field of anthropology as they have, and his only field work with the Indians-of-this area has been in conjunction with litigation. - - :

 Suphan said the reference could, not. have. been to Sherar’s Bridge- since “the falls” are either a four or twelve-day march from the Columbia at Celilo Falls or The Dalles. And Sherar's Bridge Is not more than one day away.

 so “* * * intention of Congress, ag .manifested. J)y the liberal provisions and' the history of the Indian Claims Commission 'Act, [is] to deal fairly and Justly with Indian groups * *•.*" Snake or Piute Indians v. United States 125 Ct. Cl. 241, 260, 112 F. Supp. 543. (1953).

 “If a group of .village entities speak the same dialect," move .about inore or less together in search of subsistence and- retain a hold on - the same genéral area of. land for their homes,, then * *. * - they should, be considered an. entity capable of prosecuting a elaim iind estáblíshing their right thereto as a group.”

 “Assuming for the moment that the Hualápai werfe-not a tribe in a political sense, we have a people who all- ethnologists agree, spoke ;the same language, had á co.mmoh culture, intermarried, made common use ,óf tile lands away'from their settlements, shared'their own«territories, engaged "in common economic activities^-and .considered themselves one, people.. Such factors make .the Hualapai án Identifiable group and' a’ land-owning entity un&er the ÑoQksaek, Muckleshoot, and Washoe decisions,’ 'supra.”

 “Courts cannot and^should.not be made, to. guarantee the.correctness of every agency decision. Rather it is their task,to review the decision- to - gee that it is consonant with the law,” .Wigmore,; Evidence §-25 (3d .ed. . 1940). Also Davis, Administrative Law Text, § 29.06.

 Cf., e.g., FPC v. Idaho Power Company, 344 U.S. 17 (1952) ; SEC. v. Chenery, 332 U.S. 194 (1947) ; Jacob Siegel Co. v. FTC, 327 U.S. 608 (1946) ; Ford Motor Co. v. NLRB, 305 U.S. 364 (1939). This approach is in line with Congress’ determination of the relationship between the Commission and this court. See 25 U.S.C. §§ 70a and 70s.