LittxetoN, Judge,
delivered the opinion of the court:
This is an appeal by C. W. McGhee, et ah, as members of and on the relation, of The Creek Nation East of the Mississippi, hereinafter sometimes referred to as the Creek *382 Nation East, from an order of the Indian Claims Commission denying appellants’ amended motion for leave to intervene as parties plaintiff in a suit now pending before the Commission and entitled The Creek Nation v. The United States (Indian Claims Commission Docket No. 21).
The proceeding in which appellants seek to intervene, was initiated on January 29, 1948, by The Creek Nation, a political body of Creek Indians inhabiting the Creek reservation in Oklahoma, to recover damages for the acquisition by the "United States of 23,267,600 acres of Creek lands in Alabama and Georgia, under the Treaty of August 9, 1814,[1] such acquisition alleged to have been without compensation and contrary to the Government’s obligation under the Indian Claims Commission Act[2] to deal fairly and honorably with the Indians. A trial of the issues on the merits of that claim by The Creek Nation was held, arguments heard, and the issues are now awaiting decision by the Commission. On January 5, 1951, The Creek Nation East[3] moved for leave to intervene. The motion, as later amended, was denied by the Commission.
Appellants sought intervention on the ground that the injury which was the basis of the claims asserted by The Creek Nation in Indian Claims Commission Docket No. 21, was in fact an injury to the entire Creek Nation as it was constituted in 1814, and that the unorganized descendants of members of such nation who remained east of the Mississippi Diver are as much interested in the subject matter and outcome of the litigation as are the organized descendants of that nation living in Oklahoma; that the petitioner-appellee, The Creek Nation of Oklahoma, whose membership is restricted to Creeks (and their descendants) who were living in Oklahoma and whose names were placed on the Creek rolls in 1907, is neither identical with nor the full successor to The *383 Creek Nation as it existed in 1814, and that because appellee improperly claims to be such full successor and the exclusive owner of the claim in question, it thus denies rather than represents the rights of appellants.
The petitioner-appellee and the United States both opposed the intervention before the Commission. In denying the motion to intervene, the Commission held: (1) that appellants are not members of a “tribe, band or other identifiable group” within the meaning of the Indian Claims Commission Act and they do not have a common claim, but rather have a common suit for individual claims; (2) that petitioner-appellee has the exclusive right to prosecute the claim for the 1814 injury to The Creek Nation because of various acts of recognition of that tribe by the United States, notably by the Act of April 26,1906, 34 Stat. 131; and (3) that the jurisdiction of the Commission does not extend to defining the identity of the individuals or members of the groups who may be entitled to recover on any claim placed before it, and that allowing the motion to intervene would require the Commission to do just that.
The facts which were before the Commission for the purpose of passing upon intervenors’ motion show that the members of the original Creek Nation of Indians were the aboriginal inhabitants of a large area which included nearly all of Alabama and Georgia, and parts of Florida and Mississippi. On August 7, 1790, The Creek Nation entered into a treaty [4] of friendship with the United States whereunder it placed itself under the protection of the United States and ceded certain lands. The United States, in turn, guaranteed to The Creek Nation all of its remaining lands within certain boundaries defined in that treaty. During the War of 1812, some of the members of The Creek Nation joined the British, while the others remained loyal to the United States and fought against the rebellious Creeks. With the help of the United States, the uprising was put down. On August 9, 1814, a treaty[5] was entered into between the United States and representatives of the “chiefs, deputies and warriors of The Creek Nation,” including both the loyal and rebellious *384 groups, whereby the Creeks ceded to the United States, without compensation, some 23,000,000 acres of their national domain.[6]
On January 24, 1826, the same Creek Nation concluded another treaty[7] with the United States under which it ceded for a named consideration a portion of its lands located in Georgia east of the Chattahoochee River. This treaty also provided that a portion of the Nation who had indicated a desire to move to land west of the Mississippi River, should send, at the expense of the United States, a deputation of five persons to select a country in that area as a home for those Creeks wishing to move. Subsequently, an area of land was selected in what later became the State of Oklahoma, and a small number of Creeks migrated west. As a result of further negotiations looking toward the removal of more Creeks to the Indian Territory west of the Mississippi, the Government and the Creek Nation entered into the Treaty of March 24,1832[8] whereby all of the remaining Creek land lying east of the Mississippi River was ceded to the United States. This treaty provided for the patenting of land east of the Mississippi in fee simple to those Creeks wishing to remain there, and covenanted that the treaty should not be construed so as to compel any Creek Indian to emigrate — “but they shall be free to go or stay, as they please.”[9]
Boundary disputes arose between the Creeks who settled west of the Mississippi and that portion of the Cherokee Nation who had also emigrated to that country. On February 14,1833, the United States entered into treaties with the Cherokees[10] and with the Creeks[11] settling the boundaries of their western lands. The treaty party for the Creeks were the “chiefs and headmen of the said Muskogee[12] or Creek *385 Indians, having full power and authority to act for their people west of the Mississippi.” The treaty provided that the land described would be patented in fee simple to the Creek Nation to be their property as long as they existed as a nation and continued to occupy the country assigned to them. Article IY provided that these lands should “be taken and considered the property of the whole Muskogee or Creek nation, as well as of those now residing upon the land, as the great body of said nation who still remain on the east side of the Mississippi.” Article 5 [sic] provided for certain grants of money, for the furnishing of a blacksmith, and other benefits — “It being distinctly understood, however, that the grants thus made to the Creek Indians, by this article, are intended solely for the use and benefit of that portion of the Creek Nation who are now settled west of the Mississippi.”
Following the treaty of March 24,1832, wherein the Creek Nation ceded all its remaining land in the east to the United States, that portion of the Creek Nation which remained east of the Mississippi became United States citizens and maintained no tribal organization for the holding of property. The Creeks who settled west of the Mississippi formed a new tribal organization for the holding of property and management of tribal affairs in the Indian Territory, and were variously referred to as the “Creek Tribe of Indians "West of the Mississippi,” the “Creek Nation,” and “The Creek Nation in the Indian Territory.” Subsequent to 1833, treaties involving Creek Indians were between the United States and the new tribal organization of Western Creeks and related to property and affairs of those Creeks in Oklahoma.
Toward the latter part of the Nineteenth Century, the United States embarked upon a program to abolish communal ownership of land in the Indian Territory, by dissolving the tribal form of government and by allotting tribal lands to the individual members of the tribes to the extent necessary and disposing of the remainder to settlers. Individual members of the tribes were eventually to become citizens of the United States. The Act of February 8, 1887,[13] provided, among other things, for the granting of United States citizenship to Indians who left their tribes, but it *386 guaranteed the existing rights to tribal or other property of all Indians including those who had theretofore left their tribes. Pursuant to the Act of March 3, 1893,[14] a Commission was created, and later was empowered[15] and directed to make rolls of the citizens of the tribes in the Indian Territory as a basis for the later individual allotment of tribal lands in that territory and the distribution of tribal funds. The Act of June 28, 1898,[16] provided that for the purpose of allotment of lands in the Indian Territory and the distribution of tribal funds, “No person shall be enrolled who has not heretofore moved to and in good faith settled in the nation in which he claims citizenship.” The Treaty of March 8,1900, between the United States and the “Muskogee or Creek tribe of Indians,” confirmed by the Act of March 1, 1901,[17] specifically restricted Creek enrollment for allotment and distribution purposes to those Creeks living in the Indian Territory. In paragraph 1 of the Act, “Definitions,” it was provided:
The words “Creek” and “Muskogee,” as used in this agreement, shall be deemed synonymous, and the words “Creek Nation” and “tribe” shall be deemed to refer to the Muskogee Nation or Muskogee tribe of Indians in Indian Territory. * * *
The Act of May 8, 1906,[18] reaffirmed the prior guarantee to those Indians who had left their tribes and become United States citizens, as to any rights they might have to tribal or other property. Pursuant to the Act of April 26, 1906,[19] the rolls of the Creek Nation for allotment and distribution purposes were closed on March 4,1907, and tribal ownership of land in the Indian Territory west of the Mississippi was abolished. For certain limited purposes, the Creek Nation west of the Mississippi retained and still maintains a tribal organization.
On the basis of the above facts the Indian Claims Commission has determined that appellee has the exclusive right *387 to prosecute the claim for the 1814 injury to the Creek Nation ; primarily, because subsequent to 1832, when all territory of the Creeks east of the Mississippi was ceded to the United States, all dealings of the Federal Government were had with the Creeks in Oklahoma and at no time after that date did defendant ever recognize by treaty or otherwise, those Creeks remaining east as the Creek Nation. We are unable to agree with this holding. The land which is the subject matter of this suit was not land in Oklahoma, nor was it land concerning which the United States dealt exclusively with the Oklahoma Creeks. It was land located east of the Mississippi which was obtained by the United States in 1814 under a treaty with the Creek Nation, all of whose members then lived east of the Mississippi, and whose identity as a tribe and whose ownership of the land ceded had been specifically recognized by the Treaty of August 7,1890. If an injury was inflicted by the United States in procuring and enforcing the Treaty of August 9,1814, it was an injury to the members of the Creek Nation with whom the treaty was negotiated and who owned the land in question, and not merely an injury to the Creek Indians who (or whose heirs) later emigrated to the Indian Territory west of the Mississippi and formed a new and separate tribal organization for the purpose of holding and managing property awarded to them in the west. It is true that the Creek Nation west of the Mississippi has been recognized by the United States as a political organization for the purpose of dealing with their land and affairs in the Indian Territory. If such Western Creeks have a right to make a claim for the injury to the eastern land in 1814, it is not, we think, by virtue of such later recognition nor because their names or the names of their ancestors appear on the roll completed on March 4, 1907. That Creek roll was made up for the specific purpose of allotting in severalty to Oklahoma Creeks the land owned by the tribe in Oklahoma. We believe that the rights of the Western Creeks to sue for the injury arising out of the cession of the eastern land in 1814, arise rather by virtue of the membership of their ancestors in the tribe recognized by the United States in 1814 as the owner of that land, and that those rights are in no way superior to nor different from the rights of the descendants *388 of all members of the Creek Nation as it was constituted at the time the 1814 treaty was executed. The maintenance or lack of maintenance of tribal relations and the occurrence or non-occurrence of acts of recognition of a tribal organization of the Creek Indians in Oklahoma or east of the Mississippi, subsequent to 1814, would not affect or change what was done to the Creek Nation of 1814. Any claim for an injury to the Creek Nation of 1814, is a claim belonging, if at all, to the descendants of all the members of that Nation whether they live east or west of the Mississippi, and whether organized or not, recognized or not, subsequent to that date.
We can conceive of no valid reason for holding that the claim for the wrong to. the Creek Nation in 1814 descended only to those descendants who emigrated thereafter to Oklahoma and set up a new tribal organization. Nor can we see how the failure of the Creeks remaining east to maintain a tribal organization, cures the injury done to them as members of the Creek Nation of 1814. As this court said of the Cherokee lands east of the Mississippi in the case of The Cherokee Nation v. The United States, 40 C. Cls. 252, 325; affirmed 202 U. S. 101:
The contracting party here, being also the party who made the conveyance of the Cherokee Outlet, was the' Cherokee Nation; and if the lands of the Cherokees were, like the lands of the United States, Government lands, or public lands in which the Government has the sole proprietary interest, and in which no individual has any personal interest whatever, there could not be a doubt of the exclusive right of the Cherokee Nation to have a judgment awarded in its name. But in 1835 the lands of the Cherokees east of the Mississippi, and in 1846 the lands of the Cherokees in the Indian Territory, were neither public nor private lands in the ordinary sense of those terms. The term “communal”, it is believed, is not to be found in treaties or statutes or public documents relating to the Indians prior to the date of the case of the Western Gherohees (21 C. Cls. R., 1). But the officers of the Government, under stress of circumstances— that is to say, the expectations of the Indians — have always treated Indian lands as communal, though they did not use the term and had very dim perceptions as to the nature of the estate. * * *
*389 While the United States have always, or nearly always treated the members of an Indian tribe as communal owners, they have never required that all the communal owners shall join in the conveyance or cession of the land. From the necessities of the case the negotiations have been with representatives of the owners. The chiefs and headmen have ordinarily been the persons who carried on the negotiations and who signed the treaty. But they have not formed a body politic or a body corporate, and they have not assumed to hold the title or be entitled to the purchase money. They have simply acted as representatives of the owners, making the cession on their behalf, but allowing them to receive the consideration per capita. In the present case the Cherokee Nation takes the place, so far as communal ownership is involved, of the chiefs and headmen of the uncivilized tribes. This, too, is consonant with the usage of nations. The claims of individuals against a foreign power are always presented, not by them individually, but by their Government. The claims are pressed as international, but the money received is received in trust, to be paid over to the persons entitled to it.
As to those Cherokees who remained in Georgia and North Carolina, in Alabama and Tennessee, they owe no allegiance to the Cherokee Nation, and the nation owes no political protection to them. But they, as communal owners of the lands east of the Mississippi, at the time of the treaty of 1835, were equally interested with the communal owner's who were carried to the West, in the $5,000,000 fund which was the consideration of the cession, so far as it was to be distributed per capita * * *.
. The. persons to whom distribution of this fund of $1,111,284.70, with accrued interest, would be made if they were now living would be the communal owners of the Cherokee lands east of the Mississippi. By the tripartite treaty of 1846 the Western and the Eastern Cherokees were placed on the same footing with regard to all lands east of the Mississippi and with regard to the funds derived from them. It follows necessarily that each and all of the present communal owners, whether on the east or the west of the Mississippi, and whether the descendants of Eastern or Western Cherokees, have the same individual interest in the fund and will be entitled to like amount per capita.
The appellees, however,-contend that the situation of the Cherokees in the above case is in no way analogous to that of *390 the Creeks herein because pv/rsuant to a treaty (Treaty of August "6, 1846; 9 Stat. 871) the individual Cherokees, whether Western or Eastern — r-being all those Cherokees residing East, at the date of the Treaty of 1835 and the supplement of 1836 — had a rested, interest in the balance of the treaty fund; that the terms'of the treaty changed the character of the. treaty fund, divesting it of its tribal character and vesting the individual Cherokees with an individual interest in it. The appellees further-point out that the court, pursuant to a special jurisdictional act, was permitted to apportion the judgment moneys to those Cherokees to whom the money equitably belonged. It is appellees’ position that there was no Creek treaty granting to all Creeks vested individual rights in the Creek lands here involved; that the claim here presented is a tribal one and that no individual Creek Indian has any vested interest in it; that any judgment rendered will be set up on the books of the United States' Treasury to the credit of petitioner-appellee, the Creek Nation of Indians, and no individual Creek has a vested right in that judgment fund until Congress directs that payment be made per capita to the members of the tribe. Appellees say that the unorganized Eastern Creeks lost their Creek tribal property rights, if they had any, many years before the passage of the Act of February 8,1887, which purports to save appellants’ right to prosecute this claim; that none of the Eastern Creeks were enrolled on the final citizenship rolls of the Creek Nation in 1907 and that only such enrolled Creeks can now claim to be Creek Indians entitled to any distribution of Creek tribal property.
If the claim in question arose out of treaties between the United States and the tribal organization of the Creek Nation which existed in Oklahoma, we might be persuaded by these arguments. But the land in question belonged to the Creek Nation of 1814, and the Creek Nation of the 1907 roll was in no sense the full successor to that Nation so far as the treaty of 1814 is concerned. The claim arising out of the disposition of that eastern property belongs more as does property of an intestate in the case of heirs of equal degree of relationship. The new Creek Nation was formed as a governing body to attend to the affairs and property of the *391 Creeks in Oklahoma. It is true that this claim is not vested by treaty expressly, as in the case of the Cherokees, and there is no jurisdictional act calling for the apportionment of the judgment moneys to those to whom the money equitably belongs — but the right to proceed against the Government for the injury which was to all the 1814 Creeks, arises by virtue of the fair and honorable dealings provision in the Indian Claims Commission Act, and in our opinion it arises, if at all, in favor of all those who were injured by such dealings, or their descendants. Although the Government dealt exclusively with the appellee the Creek Nation, subsequent to 1833, it dealt with the ancestors of both petitioner-appellee and appellants with respect to the particular property in suit, and there has been no occasion for further dealings with appellants since 1832. At the time the claim arose appellants were a part of the Creek Nation.
But appellees contend, and the Commission has ruled, that appellants are not an identifiable group within the meaning of the Indian Claims Commission Act. The Commission’s principal reason for holding that the appellants are not an “identifiable group of Indians” is that they have no “common claim” but rather have individual claims which they wish to settle in a common suit.
The Creek Nation east of the Mississippi which appellants represent is, in our opinion, an “identifiable group” within the meaning of Sec. 2, of the Indian Claims Commission Act; that is, this group can be identified at this time as a group of Indians consisting of the descendants of a portion of the Creek Nation as it existed in 1814. To identify is to establish the identity of, and if a group presenting a claim under the Act is capable of being identified as a group of Indians consisting of the descendants of members of the tribes or bands which existed at the time the claim arose, the jurisdictional requirements of the statute, in our opinion, have been met. It would, we think, be a strained and unwarranted interpretation of the Act to say that Congress intended by the term “identifiable group” that the group making the claim must be identical, as a distinct entity, with the tribe or band existing at the time the claim arose. Such interpretation would make the term “identifiable group” mean nothing *392 more than a recognized tribe or band. Clyde F. Thompson, et al., on the relation of the Indians of California, Appeal No. 9, decided this day. [Ante, p. 348.]
The injury complained of by the petitioner-appellee which is an organized tribe, and by appellants who, until recently, were unorganized, was an injury to a tribal or group right. In 1814 the land said to have been taken by the United States, under the treaty, was tribal property. The Commission has ruled, and this court has always taken the view, that a claim for the taking of tribal lands is a common claim, the ownership of the land being tribal and not individual. It is the (nature of the ownership of the land at the time taken that determines the character of the claim arising from that taking. If the ownership was in individual members of the tribe in 1814, and the injury thus to those individuals, the later forming of a tribal organization to include such members or their descendants would not transform individual claims into a common claim or the individual injury into a common one. On the other hand, if the claim when it arose was a tribal or common one, the later disbanding of the entire tribe and the complete absence of a tribal organization as a political entity at the time of suit on the old tribal claim, would not affect the character of the claim as a tribal claim. In the instant case, a portion of the membership of the 1814 tribe banded together in a separate political organization af ter the injury to the tribal property occurred, and the remaining members of the 1814 tribe abandoned all tribal organization and became United States citizens. These circumstances did not, we think, alter the tribal or common nature of the injury or the claim therefrom. The further fact that the United States has never recognized by treaty or otherwise the recently formed tribal organization of Eastern Creeks, does not, we think, defeat their right to present a claim to the Indian Claims Commission as an identifiable group, inasmuch as they are seeking to become parties-plaintiff on a common or tribal claim, as representatives of the descendants of a large group of members of a tribe which was recognized by the United States, and the claim arose out of a treaty between such recognized tribe and the United *393 States. If the Eastern Creeks cannot intervene and become parties in the suit on this claim because, as a group, they have never been recognized by or participated in treaties with the United States, since 1832, then it would appear, that the Creek Nation west of the Mississippi also would have no standing to sue because, as presently constituted, that nation was not a treaty party in 1814, when the property in question was ceded. In Red Lake, Pembina and White Earth Bcmds, Ind. Cl. Com. Docket No. 18-A (September 17, 1951), the Pembina Indians were an organized band recognized as such by the United States at the time of the treaty in suit. The Government contended that because the Pembina Band ceased to exist as an organized tribe in 1891, no identifiable group or band was in existence to bring suit before the Commission. In holding that the Pembina Indians were entitled to sue, the Commission said:
* * * claimants who are permitted to assert claims under the Indian Claims Commission Act, namely, a “tribe, band, or other identifiable group” do not have to be existing political groups in order to be heard by the Commission. The controlling question is whether the claimant group can be identified and have a common claim. * * *
As the plaintiffs concede that the Pembina Indians are no longer organized as a band, the question then is whether members, or descendants of members of the Pembina Band as it existed and was recognized at the time of the 1863 treaty, can be identified. If they can be so identified, then any one of their group is authorized by express statute to present this claim as a representative of all the members, as provided by Section 10 of the Indian Claims Commission Act (25 U. S. C. 70a), which provides that: “any claim within the provisions of this Act may be presented to the Commission by any member of an Indian tribe, band, or other identifiable group of Indians as the representatives of all its members.”
We believe that it is such a representative action that is presented here. It is true that in the caption of the petition the Pembina Band is named as one of the plaintiff bands, which would indicate that the claim was presented by an existing organized band; however, the allegations of the petition clearly show that this claim is presented by individual members, or descendants of *394 members, of the Pembina Band or Group .of Chippewa Indians which was a party to the 1863 treaty cession of lands, out of which this claim arises, and that they are acting as the representatives of all the members or descendants of members of said band. ' ■
Accepting as true the allegation of appellants that they represent the descendants of those members of the Creek Nation in 1814 who remained east of the Mississippi River, it would appear to be both proper and necessary that the eástern group be allowed to intervene by their representatives in order that all those who may be legally entitled to share in a possible recovery for the injury to their common ancestors, be before the Commission. A continuous integrated process of litigation is greatly to be desired in settling these Indian claims, and the allowance of the intervention by a group who claims an interest in the judgment or who will be adversely affected by its disposition, is one of the steps in the attainment of this objective. As a matter of justice, and to bring about a thorough administration of the law laid down by the Indian Claims Commission Act, we think that where all interested persons have not been made parties to the proceeding by joining in the original petition, the Commission has full power to allow such persons, constituting an identifiable group of Indians such as we have here, to intervene or be made parties regardless of the lack of specific language to that effect in the Act, or the failure of the Commission to formulate rules relating to intervention.
The Commission and the appellees appear to take the position that because a tribal organization of Creek Indians does exist which has been recognized by the Secretary of Interior, it must be the representative of all Creek Indians and have the exclusive privilege of presenting any claim for such Indians. The Creek Nation in Oklahoma has only been recog-nied by the Secretary of Interior as having authority to represent the Creek Indians in Oklahoma. It has never been recognized as having authority to represent the unorganized but identifiable group of Creeks east of the Mississippi, and therefore is not entitled under the Indian Claims Commission Act to the exclusive right of representing such Eastern Creeks. Accordingly, the group of Eastern Creeks are en *395 titled to be represented separately by representatives of their choosing. The legislative history of the Indian Claims Commission Act and the language of the Act itself indicate that it was the intention of Congress to provide for the complete and expeditious settlement of all just and equitable Indian claims, and denial of intervention to the representatives of the descendants of a group constituting a portion of the Creek Nation as it existed in 1814, in a suit involving an injury to that Nation, would defeat such purpose.
But the Commission concluded that there was a further difficulty to permitting intervention, in that its jurisdiction does not extend to defining the identity of individuals entitled to share in any award made. We do not believe that taken as a whole, the petition of the intervenors requires the Commission to determine the identity of the individual Indians who may participate in any award made. We think rather that the petition to intervene raises the question whether only the petitioner-appellee and its members are entitled to prosecute the claim arising under the 1814 treaty, or whether the representatives of the entire Creek Nation, as it was constituted in 1814, are the proper parties to prosecute the claim. This issue of fact and law regarding the ownership of the claim is threshold to a proper and complete determination of the claim arising out of the treaty of 1814. Although both the Government and the appellee contend that the Commission has no jurisdiction to try this issue, the Commission has in fact decided it as follows:
* * * We are of the opinion that the petitioner in this case has the exclusive right to prosecute the claim here asserted.
The Government and the petitioner-appellee appear to agree with that holding of the Commission and are asking that it be affirmed. At the same time, they take the position that if this court should disagree with the Commission’s holding, reversal should not follow because the Commission had no jurisdiction to try such an issue in the first place. As we have stated above, the Commission had full power to determine such an issue. Appellants suggest that the proper procedure would have been for the Commission to permit *396 intervention and then, after a trial, decide the issue of whether the claim sued on is the property of the Creek Nation in Oklahoma, or, as appellants contend, the property of the descendants of the entire Creek Nation as it existed in 1814. We agree that this would have been the preferable procedure. Inasmuch as such a course was not followed, however, we have no choice but to pass on what the Commission has in fact done, and we believe that the record before us is sufficient for that purpose.
In summary, we hold first that it was within the power of the Commission to allow the motion to intervene and that under the circumstances of this case, the motion should have been allowed. Next, we hold that the Commission erred in holding that the petitioner-appellee has the exclusive right to prosecute the claim here asserted. Although, as suggested by appellants, this decision of the Commission may have been premature; the record before the Commission and now before the court indicates, and we hold, that if there was an injury inflicted by the 1814 treaty, it was an injury to the Creek Nation as it was then constituted, and that any recovery for such injury should be for the benefit of all the descendants of that nation and not for the exclusive benefit of the organized tribe or nation in Oklahoma. And, finally, we hold that in the event of an award for such an injury, it should be for the benefit of all descendents of the Creek Nation as it was constituted in 1814, and recognized by the United States in the treaty of cession of that year, the method of determining the identity of such descendants to be provided for by Congress in making an appropriation to pay the award.[20]
The decision of the Indian Claims Commission denying appellants’ motion to intervene is reversed, aiid the case remanded to the Commission for further proceedings in accordance with this opinion.
Howell, Judge; Maddbiv, Judge; Whitakek, Judge; and JoNes, Chief Judge, concur.

 7 Stat. 120.

 Act of August 13, 1946, 60 Stat. 1049, 25 U. S. C. 70.

 The original motion to intervene was made on behalf of The Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians. On August 81, 1951, the Indian Claims Commission issued an order allowing the motion of C. W. McGhee, Ruby Z. Weatherford, John V. Phillips and John Williams, as members of and on the relation of The Perdido Friendly Creek Indian Band of Alabama and North West Florida Indians to change the name of that Band to The Creek Nation East of the Mississippi.

 7 Stat. 35.

 7 Stat. 120.

 It is tlie contention of the petitioner-appellee in its claim pending before the Commission, that the treaty of 1814 was entered into by the Creeks under duress, and that the actions of the united States in so procuring the cession of tribal lands without compensation violated all standards of fair and honorable dealings within the meaning of the Indian Claims Commission Act.

 7 Stat. 286.

 7 Stat. 366.

 Article XII.

 7 Stat. 414.

 7 Stat. 417.

 The Creek Nation of Indians were sometimes known and referred to as the Muskogee Confederation.

 24 Stat. 388.

 27 Stat. 612, 645.

 Act of June 10, 1896, 29 Stat. 321, 339.

 30 Stat. 495, 503.

 31 Stat. 861.

 34 Stat. 182.

 34 Stat. 137.

 Indians of California v. The United States, 98 C. Cls. 583, cert. den., 319 U. S. 764.