Collins, Judge,
delivered the opinion of the court:
This case comes before us on appeal by the United States from an interlocutory order of the Indian Claims Commission (hereinafter the Commission). Beview is sought with respect to the Commission’s determination that petitioners (appellees herein) “have satisfactorily established that at the time of the September 18,1823 treaty cession * * *, and long prior thereto, the Seminole Nation held [exclusive of certain designated areas] original Indian title to all of the present State of Florida * * The Commission’s order is challenged on the ground that there is no substantial evidence to support it.
We approach the record not with a view towards deciding the matter de novo, but rather with a view towards deciding whether the evidence considered as a whole could reasonably have supported the decision that was reached. “Our imprimatur is one of reasonableness, not rightness.” Confederated Tribes of the Warm Springs Reservation of Oregon v. United States, 177 Ct. Cl. 184, 207 (1966). And on that basis we affirm.
On September 18, 1823, the United States and the Seminole Nation entered into a treaty (commonly referred to as the Camp Moultrie Treaty), which provided in substance for the relinquishment by the Indians of “all claim or title which they may have to the whole territory of Florida,”[1] the Indians receiving in return the promise of a protected reservation (carved out of the cession) and consideration (both monetary and other) totaling $152,500. Thereafter followed the Treaty of Payne’s Landing[2] on May 9, 1832— a measure designed to accomplish the relocation of the Semi *378 nole Indians from their then just recently granted Florida reservation to the Indian Country in Oklahoma.
The appellees in this action comprehend both groups of Semmoles — those Indians who removed to Oklahoma and those Indians who remained in Florida — each group having been recognized as a successor in interest to the Seminole Nation as it existed in Florida in 1823. Their claim-in-chief relates to the alleged inadequacy of consideration received from the United States under the terms of the above-cited Camp Moultrie Treaty.[3] The first step< in the successful litigation of the claim involves the issue now before us, namely: Whether there is substantial evidentiary support for the Commission’s conclusion that the Seminole Indians held original or Indian title to most of the lands in Florida. The arguments advanced by the United States (discussed infra) require, at this point, a brief review of Florida’s Indian history.
From the Commission’s findings of fact, we glean the following:
At the time of the Spanish discovery and settlement of Florida in 1512, the land was occupied by regionalized aboriginal cultures, more than 25 of which have been separately identified. Collectively, these groups comprised approximately 50,000 people. Two ways of life existed. In the north (that is, assuming a latitudinal divide running between Tampa Bay and Cape Kennedy), agriculture prevailed; in the south, a hunting and nomadic existence. Neither offered Spain the exploitative advantages that more advanced economic systems could make available to a conqueror. Moreover, the militancy of the people in south Florida compelled Spain to abandon her attempts to exercise control over them and, as a result, Spanish influence — which derived mainly from various missions that had been established- — was confined almost exclusively to north Florida.
By 1625 this Spanish mission system, which then comprised 16 separate settlements radiating westward from St. Au *379 gustine, bad attracted numerous aborigines, some drawn because of trade, others because of their conversion to Christianity. This spread of civilization and its attendant shifts in aboriginal population precipitated a gradual decline in the Indian population stemming, in the main, from internecine struggles between the “converted” and the “heathen” (with consequent Spanish punitive action) and, more importantly perhaps, from the introduction of European diseases against which the Indians possessed no immunity. A further factor accounting for the population decline, and one which figures most prominently in the Seminole history (as well as in the history of Spanish Florida) traces itself to the English establishment of the South Carolina colony in 1610.
The plantation economy of the Carolina colony demanded an abundant labor supply, a factor which in turn gave rise to numerous “slave” raids led by Carolinians staffed with Indian allies. The Indians of Florida bore the brunt of these attacks. So extensive were the slaving expeditions that, by the early 1100’s, the once viable Spanish mission system, together with its clustered aboriginal population, was virtually eliminated. The immediate environs of St. Augustine offered the last refuge for the Spanish as well as for the northern aborigine.
The evidence dealing with the southern aborigines, while much weaker (that is, from the anthropological standpoint), indicates a similar population decline, but here, unlike in the north, scattered aboriginal settlements appear to have survived, with some of the Indians having retreated into the Everglades for safety. The general condition, with respect to the area in its entirety, was one which expert witnesses characterized as a demographic void or population vacuum. But this ebb tide of population decline was of short duration.
Into the void stepped a new element — the former Indian slave raiders. These Indians — of Creek origin — mark the beginning of -a people who, at a later date, were to become known as the “Seminóles.” To their numbers may be added the Indians who fled from Carolina after the abortive Indian uprising of 1115 — an event which history records as the Yamasee war. Further population increases occurred when *380 Spain — quick to enfold tlie changing wind of Indian loyalty — undertook to encourage additional elements among the Lower Creeks to settle in the depopulated areas of northern Florida. Settlements reappeared in the present-day areas of Tallahassee and Gainesville; included among the immigrants were some of the original Florida Indians.
During the same period that northern Florida was undergoing its erratic, but continuous, population rebirth, the surviving remnants of the southern aborigine continued with their traditional way of life. Although the population decline had been far-reaching, the evidence supports the Commission’s finding that, “in southeast Florida, along the Atlantic coast from Fort Pierce south to Miami, and down along the Keys,” Indians were known to live as early as 1700 and as late as 1763.13 Ind. Cl. Comm, at 332. These Indians, like their northern contemporaries, came to be regarded by the Europeans as Seminóles.
The year 1763 witnessed the end of the first Spanish period in Florida. With the signing of the Treaty of Paris — which brought to an end the struggles among the European powers in the Seven Years’ War- — Florida was given over to the English in return for Havana. In the half century which preceded this event, Spanish influence had been in continuous decline. This had been a period of intermittent military engagements between the English and the Spanish, a period of Creek factionalism (the Indians being divided between pro-English and pro-Spanish elements), and a period during which the Indians of Alachua (near modem Gainesville) had begun to emerge as a group independent of its Lower Creek ancestry. By 1765 we have clear reference to these Indians in northern Florida as “Seminóles.”
Whereas the Spanish had sought to rale through conquest and conversion, the English proceeded upon an entirely different course in their relations with the Indians. For the next 20 years, a period of relative tranquillity ensued. The English recognized the Indians’ rights to -use of the land and, to this end, as well as for the more effective administration of the territory, they entered into treaties with the Creek Indians which fixed the boundaries within which each group (Indian and European) could claim an exclusive right of *381 possession. Though the Seminóles were not signatories to these treaties (nor have the lands which the English received in these negotiations been included, by the Commission, within the scope of the Seminóles’ title), circumstances surrounding the negotiations reflect a recognition by the English that the Seminóles were to be considered as a group falling outside of the mainstream of the Creek Nation.
The English period is important in other aspects, notably for trade with the Indians. Southern Florida became the hunting preserve to which the Indians turned in search of the game needed to satisfy the growing European demand for hides. The Seminóles began to prosper, and the number of their villages increased. The evidence establishes the existence — at this time — of at least five Seminole towns in northern Florida. By 1783, 20 years of English control were brought to an end; Spain once more became the principal European power in Florida.
But unlike their first period of sovereignty, the Spanish now found it impossible to rely upon the mission system as a vehicle of control. Having flourished with trade, the Indians pressed for, and obtained, its continuation. Spain, lacking commercial capacity of her own, permitted the English trading interests to remain in Florida. During this time, Florida’s Indian population continued to increase. The accretions, though small, were constant — their flow insured by the white man’s continuous displacement of the Indian in the north. These drifts in population contributed to the on-going process of Seminole evolvement. Two Seminole language groups ■ had by now become defined. In the Apalachee area of northern and western Florida, the Muskogee tongue was common. In central and southern Florida — around Alachua — Hitchiti was the prevalent language. The Hitchiti-speaking Semi-nóles maintained no ties with the Creek Nation.
With the Forbes’ Purchase of 1804, we are offered persuasive evidence that the Seminóles — though diverse in language and ancestry — had achieved by that time a degree of both political and territorial independence.
The English trading firm of Panton, Leslie & Company, which had continued in operation in Florida under the express request of the Spanish, had become the involuntary *382 creditor of the Seminóles. The Commission’s finding notes that “in order to satisfy this indebtedness, The Seminole Nation sold a parcel of land about forty miles square, lying between the Appalachie and Appalachicola Rivers.” 13 Ind. Cl. Comm, at 337. This gale, known as the Forbes’ Purchase (after the trading company of the same name, that succeeded to Panton, Leslie & Company’s interests) has been recognized as a bona fide sale by the Seminole Nation.
Though Spain was to retain possession of Florida until 1819, her position of control during this second period of rule was one in name only. The English dominated the peninsula’s commercial structure; the political structure was dominated by American expansionism. For the Seminóles, it was a time of turmoil. They were subjected to attack from the north by Georgians, whose raids (conducted with the covert approval of the United States) were allegedly for the purpose of reclaiming the numerous runaway slaves that had found their refuge with the Indians. These raids, which might be regarded as a forerunner of things to come, were costly. They exacted their toll of the Seminóles both in terms of loss of wealth and in loss of leadership.
In 1814 the Seminóles experienced their last significant population growth. It was at this time that a large part of the Creek Nation fled to Florida and joined with the Semi-nóles. These Creeks — referred to as hostiles or “Redsticks”— had rebelled against their tribal leadership and its allegiance to the Americans. They fought against the United States, were defeated by Andrew Jackson, and thereafter left their Alabama homeland. More than 4,000 Creeks were involved in this exodus. Like the Seminóles, with whom they assimilated, they shared both fear of and 'hostility towards the Americans.
The expulsion of the English following our War of 1812 did little to assuage the hostility between the Florida Indians and the people of the adjoining states. The territorial ambitions of each soon brought conflict between them. The first Seminole war, which was fought between the Tudians of Florida and the United States, not only quelled Indian resistance (at least for a time), but demonstrated most effec *383 tively America’s complete mastery over Spanish Florida. The relinquishment of Florida took place in 1819.
The subsequent decline of the Seminóles that accompanied the consolidation of United States power in Florida need not be recited. The background we have sketched to this point provides a sufficient basis upon which to examine the Government’s present contention.
The concept of Indian title is a shorthand means of ex-\ pressing a right of occupancy based upon exclusive aborig-; inal possession. Proof of such possession rests in the “showing t of actual, exclusive and continuous use and occupancy ‘for a > long time’ prior to the loss of the land.” Confederated Tribes) of the Warm Springs Reservation of Oregon v. United States,I supra, 177 Ct. Cl. at 194, and authorities cited therein. It is \ claimed by the United States not only that the Commission’s findings fail to support the conclusion that the Seminóles had such title, but further, that the history of the Seminóles is such that this conclusion could not have been reached. The elements necessary to establish Indian title provide the focus of discussion.
There can be little question that, in their occupation of the land, the Seminóles held a virtual “monopoly.” "While expert witnesses concede the contemporaneous existence of other Indians in Florida (remnants of original inhabitants located primarily in the southern half of the peninsula), these scattered groupings were few and far between, and the record offers no evidence to suggest that Seminole dominion was ever challenged by these vestiges of aboriginal cultures. Instead, the pattern that prevailed was one of cultural assimilation — the Seminóles simply absorbing these “foreign” elements into their own ranks. We may take it as an uncon-tradicted fact that, but for the different European interests, the Seminóles enjoyed an unrivaled position in the Florida peninsula. Hence, the matter in issue turns not upon whether f the Seminóles were the exclusive occupants of the land but, j rather, whether they availed themselves of their exclusive \ position. In short: Was the Seminóles’ use and occupancy' of the land of an extent sufficient to support a recognition! of Indian title encompassing virtually all of the Florida} *384 ¡peninsula? [4] The Government urges several factors which it insists compel a negative answer.
First, reference is made to the fact that, as late as 1802, Seminole “occupancy,” as reflected by the village settlements, was limited both in number and range of distribution. It is pointed out that permanent Seminole settlements were confined almost exclusively to the northern half of Florida; moreover, the permanent settlements do not appear, at this time, to exceed II in number. In conjunction with this fact, the Government also stresses population figures, pointing out that, up to 1814 (the year in which many “Bedsticks” joined with the Seminóles), total Seminole population did not exceed 2,500 individuals. The combination of these two factors is said to compel but one conclusion, namely, that the Seminóles neither did occupy, nor were they numerically capable of occupying, a territory as vast as all of the Florida peninsula.
Had the Seminóles chosen to live by 'food-raising alone, we would regard the “village” evidence (stressed by the Government) as a persuasive consideration in limiting the Semi-nóles’ “title” to the land falling within the compass of their permanent homesites, i.e., the northern half of the peninsula. Cultures that stake their survival upon a close union with the soil, as is the case with primitive food-raising economies, would not demand the vast tracts of land required for a nomadic, hunting existence. But the Seminóles — as was the case with many other Indian groups — survived not simply through farming, but by food-gathering and hunting as well. In other words, Seminole land-use clearly encompassed more than the soil actually “possessed.” Therefore, other aspects of the Seminole pattern of life demand consideration.
Not only did these Indians wander in search of food supplements but, as already indicated, the appearance of the English in Florida spurred a demand for hides that compelled the Seminóles to make extensive use of the southern peninsula. On this point, the record admits of no doubt. It *385 is clear, from the Government’s own evidence, that the Semi-nóles’ “hunting preserve” extended to the Florida Keys. Such extensive penetration of the peninsula could be accomplished only by resort to temporary encampments — a home away from home. This, too, the record confirms. Again, it is worth emphasizing that the Seminóles hunted not only for subsistence, but also to sustain the trade which the English had initiated and which the Spanish, after them, were obliged to continue. Under such circumstances, the Indians’ use of the land would not be minimal; moreover, this trade could reasonably demand a use of the land ranging well beyond the immediate environs of the permanent village sites.
In addition, the Seminóles traveled the inland waterways by canoe — covering as many as 40 miles per day — and from other reliable evidence we gather that, as early as 1740, the Seminóles had taken canoe trips to Havana with the eastern shore of the southern peninsula serving as their departure point. Again, by reference to the Government’s evidence, we are informed that, as early as 1771, Seminole travel accounts for their appearance along the shores of western Florida.
Given these facts — which are not in the slightest way ‘ disputed — we believe that the Commission, as the trier of, fact, could reasonably have concluded that Seminole “use and occupancy” was adequate to sustain a claim of original title to the Florida peninsula. The area acknowledged by the Commission as being within Seminole dominion constituted a definable territory occupied exclusively by the Seminóles. And since the “use and occupancy” essential to the recognition of Indian title does not demand actual possession of the land, but may derive through intermittent contacts, Spokane Tribe of Indians v. United States, 163 Ct. Cl. 58, 66 (1963), which define some general boundaries of the occupied land, Upper Chehalis Tribe v. United States, 140 Ct. Cl. 192, 155 F. Supp. 226 (1957), the Commission’s determination that the Seminóles occupied all of Florida may not be regarded as, legally defective.
Nor does the Government’s reference to “population thin-' ness” compel a different result. In stressing this consideration, the Government leans far too heavily in the direction of equating “occupancy” (or capacity to occupy) with actual *386 possession, whereas the key to Indian title lies in evaluating the manner of land-use over a period of time. Physical control or dominion over the land is the dispositive criterion. Thus, when consideration is given to the fact that the Semi-nóles hunted throughout the southern peninsula and that they also traveled this territory — much of which was covered by water — and, further, that their emergence as a distinct Indian group was achieved through the amalgamation of many diverse elements, some of which had always dwelt within the southern peninsula — then, we believe, there exists a reasonable basis for our accepting the Commission’s determination that Seminole title embraced the entire peninsula.
As a final matter, the Government stresses that, even if exclusive use and occupancy be established, nevertheless the Seminóles did not occupy their land for a period of time sufficient to obtain recognition as “owners.” In arguing this position, the Government challenges the Commission’s finding that the Seminóles, “through their aborigine stock, were a people able to trace their ancestry beyond recorded history.” 13 Ind. Cl. Comm, at 333.
As a matter of record, the Commission’s finding is well supported. All of the original inhabitants of Florida were not exterminated. Those surviving were absorbed into the Seminole ranks. We therefore perceive no basis to support a challenge as to the factual accuracy of the Commission’s finding. It is supported by substantial evidence. But the legal significance of the finding is another matter. The Government contends that the Commission committed error in measuring the span of Seminole occupancy through the lineage of those aborigines which they (the Seminóles) had absorbed. By this “tacking of occupancies” the timespan of continuous land-use would be dated back to a point in time preceding the emergence of the Seminóles as “the” Florida Indians.
In principle, we do not disagree with the Commission’s approach. Cultural assimilation extinguishes the identity, but not the people. Therefore, whatever land rights were possessed by those absorbed may be recognized as inhering in the culture that emerges. The difficulty hi applying this *387 principle to the situation at hand is that the Commission failed to specify the areas in which the Seminóles could claim title through assimilation. Nevertheless, we do not regard this as a fatal defect. For, even if the Commission had measured the Seminóles’ occupancy at a later date, i.e., from the time that they were first clearly denominated as Semi-nóles (1765), still the more than 50 years that would have elapsed between that date and the date of cession (1823) would have been sufficient, as a matter of law, to satisfy “the long time” requirement essential for Indian title.
A final word should be added concerning the Government’s claim of inadequacy in the Commission’s findings. The contention made is that the findings suffer from a lack of specificity and that more attention should have been paid to identifying the sources from which their content was derived.
To some extent we share this view. But fairness to the Commission requires us to emphasize that the vast array of historical source material relating to the Seminóles’ claim was brought together most effectively by expert witnesses, and it is their testimony — introduced by both parties — which represented the foundation for the Commission’s findings. Significantly, this testimony reflected not disagreement, but rather an almost total agreement insofar as the Seminole history was concerned. In light of this agreement, the Commission’s function, at least to this point, has involved not the resolution of disputed factual matters but, rather, the determination of an ultimate fact, i.e., that Seminole use and occupancy was adequate to support a claim to Indian title. Since the province of 'appellate review does not allow for a substitution of judgment, but demands the affirmance of a decision that is reasonable in light of the evidence, the Commission’s grant of Indian title to the Seminóles must be upheld.
Accordingly, the interlocutory order of May 8,1964, of the Indian Claims Commission is affirmed, and the matter is returned to the Commission for further appropriate proceedings.

A/ftrmed.

 Article I, Treaty with The Florida Tribes of Indians, 7 Stat. 224 (1823).

Treaty with The Seminoles, 7 Stat. 368 (1832).

 The Indian Claims Commission Act, ch. 959, § 2, 60 Stat. 1049, 1050 (1946), 25 U.S.C. § 70a (1964), which provides the statutory authority under which the Seminóles sue, treats, as cognizable:
*** * * (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity;

 As determined by the Commission, Seminole title embraced that part of the present State of Florida which extended southward from the Old Spanish Road to and including the Florida Keys. To be excluded from this territory are three areas. They comprise (a) lands sold by the Seminóles in 1804, (b) lands deeded the English by the Creeks in 1765, and (c) lands which the united States has recognized as confirmed Spanish land grants.