**C. W. McGHEE, Ruby Z. Weatherford, John V. Phillips and John Williams, as Members of and on the Relation of the Creek Nation East of the Mississippi**

v.

**The UNITED STATES.**
**Appeal No. 1–70.**

United States Court of Claims.
Feb. 19, 1971.

Carl Elliott, Washington, D.C., attorney of record, for appellants. C. LeNoir Thompson, Bay Minette, Ala., Micah H. Naftalin, and Tobias Naftalin, Washington, D.C., of counsel.

Lester Reynolds, Washington, D.C., with whom was Asst. Atty. Gen., Shiro Kashiwa, for appellee.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

COLLINS, Judge:

This case is on appeal from a decision of the Indian Claims Commission[1] deny-

---

1. McGhee ex rel. Creek Nation East of the Mississippi v. United States, 22 Ind.Cl.Comm. 10 (1969).

ing appellants' motion for leave to amend their petition, and dismissing that petition in pa:t. The appellants are descendants of the original Creek Nation of Indians and appear here as members of and on the relation of the Creek Nation East of the Mississippi.[2]

On September 18, 1823, the United States and the "Florida Tribes of Indians" entered into the Camp Moultrie Treaty,[3] under which the Indians ceded to the United States "all claim or title which they may have to the whole territory of Florida, with the exception of such district of country as shall herein be allotted to them." [4] In return for the cession the Indians received a protected reservation, within the ceded territory, and monetary and other consideration totaling approximately $152,500.

On August 9, 1951, the appellants filed their petition with the Indian Claims Commission alleging that, by entering into the Camp Moultrie Treaty, the United States had obtained Creek lands "now a part of the State of Florida consisting of 8,616,960 acres, lying South of the 31st parallel and Ellicott's line"[5] in contravention of the guarantees of an earlier treaty with the Creek Nation.[6] The precise location of the 8,616,960 acres was not stated. On oral argument before this court, however, counsel for appellants identified the territory in question as the northernmost 8,616,960 acres in the State of Florida.

On August 14, 1950, about 1 year before the filing of the Creek petition, the Seminole Indians of Florida filed a claim with the Commission for compensation for lands approximately identified as the whole of the present State of Florida.[7] The Seminole claim, too, had its origin in the Camp Moultrie Treaty.

On October 31, 1955, the Government, appellee herein, filed its answer in the Creek case. In its answer the Government raised the possibility of an overlap with the Seminole claim:

> 26. Other claims are now pending before the Indian Claims Commission to lands in the area of the present state of Florida, and so far as defendant is able to ascertain from the incomplete and inadequate description of the lands which are the subject matter of this suit said lands are believed to be the same as those for which said other claims are now pending.[8]

For reasons which are not readily apparent neither appellants nor the Government moved for consolidation of the Creek and Seminole cases for trial.

The Seminole claim came to trial first and, on May 8, 1964, the Commission issued its decision in Seminole Indians v. United States, 13 Ind.Cl.Comm. 326 (1964) (hereinafter *Seminole*), to the effect that, as of the time of the Camp Moultrie Treaty "[t]he Seminole Nation had Indian title [based upon exclusive use and occupancy in Indian fashion] to an area which may be generally identified as all of Florida, including the Keys, south and east of The Old Spanish

---

2. The Creek Nation East of the Mississippi was determined to be an "identifiable group" within the meaning of § 2 of the Indian Claims Commission Act in McGhee ex rel. Creek Nation East of the Mississippi v. Creek Nation (United States), 122 Ct.Cl. 380, cert. denied, Creek Nation v. McGhee, 344 U.S. 856, 73 S.Ct. 90, 97 L.Ed. 665 (1952).

3. Treaty with The Florida Tribes of Indians, 7 Stat. 224 (1823).

4. *Id.*

5. Petition at 9.

6. The earlier treaty referred to was A Treaty of Peace and Friendship, 7 Stat. 35 (1790). This treaty guaranteed to the Creek Nation all its lands within the United States to the south and west of a boundary in Georgia.

7. On July 23, 1951, the Seminole Indians of Oklahoma filed a claim with the Commission which wholly overlapped the Florida Seminole claim. Thereafter, the two Seminole claims were consolidated.

8. Answer at 11–12.

Road * * *."[9]  *Id.* at 367. The Commission's decision was affirmed by this court in United States v. Seminole Indians, 180 Ct.Cl. 375 (1967), and the matter was returned to the Commission for further proceedings.

On November 26, 1968, the Government moved to dismiss appellants' original petition on the grounds that the Commission, in the *Seminole* case, had precluded a finding that the Creeks, at the relevant time in history, had exclusive use and occupancy of any portion of the present State of Florida.[10]  The motion was denied, however, by order of March 26, 1969, the Commission holding that "plaintiff is not at this time barred as a matter of law from presenting its evidence in support of the claim set forth in its petition and the motion to dismiss is premature."

On July 3, 1969, appellants filed their pretrial statement with the Commission. In that statement, for the first time, the appellants asserted that the Seminole Indians were an integral part of the Creek Nation.  On July 16, 1969, appellants filed a motion for leave to amend their petition in order to assert Indian title, at the crucial time, to all of the present State of Florida.  The essential ground of the motion was that, prior to and during 1823, the Seminoles were a constituent part of the Creek Nation and that only the Creek Nation as such could alienate its lands.

The Government opposed appellants' motion to amend and moved to dismiss the petition insofar as the lands claimed in it overlapped lands of which the Seminoles had already been determined to have been aboriginal owners.  Alternatively, the Government moved for consolidation of the Creek claim and the Seminole claim to the extent of any overlap.[11]

On November 13, 1969, the Commission denied appellants' motion to amend and dismissed the petition to the extent of any overlap with the lands awarded in *Seminole*.  McGhee ex rel. Creek Nation East of the Mississippi v. United States, 22 Ind.Cl.Comm. 10 (1969). With respect to appellants' motion, the Commission held that the proffered amendment constituted a new cause of action which the Commission was without jurisdiction to consider because the last date on which a new cause of action could be filed before the Commission was August 12, 1951.[12]  In dismissing appellants' petition in part, the Commission stated that to permit an overlapping claim would result in an impermissible collateral attack on the *Seminole* decision.

The Creeks have appealed.  For reasons which follow we affirm in part, reverse in part, and remand.

### The Proffered Amendment

The appellants' primary contention with respect to their proffered amendment is that it does not state a new cause of action; it merely seeks to increase the amount of recovery sought. We disagree.

The Commission has held, and this court has recognized, that an amendment

---

9.  There were three areas within the described territory which were excluded: (1) the confirmed Spanish land grants, (2) the lands in the Forbes Purchase, and (3) the lands in the Picolata Purchase.

10.  The Government contended that, in addition to its finding with respect to the land south of the Old Spanish Road, the Commission had found that the Florida lands north of the road served in 1823 as a buffer zone between the Seminole lands in Florida and the Creek lands which were located in parts of the present States of Georgia and Alabama.

11.  At that time the Seminole claim had not proceeded to final judgment.

12.  The Indian Claims Commission Act provides as follows:
    "The Commission shall receive claims for a period of five years after August 13, 1946, and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress."  25 U.S.C. § 70k (1964).

to the petition which merely extends the boundaries of the lands claimed "does not set forth a new cause of action which would be barred by Sec. 12 of the Act." Pueblo de Zia v. United States, 11–A Ind.Cl.Comm. 131, 162 (1962); see United States v. Northern Paiute Nation, 393 F.2d 786, 791, 183 Ct.Cl. 321, 330 (1968). If all that were involved in this appeal were an attempt by the appellants to amend the petition in order to extend the boundaries of the lands claimed, we would have little difficulty in reversing the Commission. This is not the case, however.

▆ The Commission found, correctly in our opinion, that "not only the quantum of relief varies, so does the theory of recovery, so does the property upon which the claim of relief is founded. In fact, all varies save only the parties plaintiff." 22 Ind.Cl.Comm. 10, 13 (1969). In their original petition, the appellants clearly relied upon alleged Creek ownership of an area of northern Florida. In their proffered amended petition, the appellants would, in addition, rely upon Seminole ownership of all but a small part of the rest of Florida. Alleging that the Seminoles were a constituent part of the Creek Nation, and relying upon that alleged fact as the basis of a claim to ownership of vast additional areas, amounts, in our opinion, to a cause of action separate and apart from that outlined in the original petition. As such, it is barred by the limitation date set forth in 25 U.S.C. § 70k (1964).

On oral argument before this court, counsel for appellants stated, in response to a question from the bench, that the appellants possess evidence of ownership of Florida in addition to evidence that the Seminoles were actually Creeks. We view this as an afterthought, however, unsupported by the briefs.

### The Overlap

Regarding the overlap, it should be noted at the outset that, as yet, there has been no determination that there is, in fact, an overlap, partial or otherwise, between the lands claimed by the appellants in their original petition and the lands awarded in the *Seminole* case. We deal with this point on the assumption that, as appears likely, there is an overlap.

In dismissing appellants' petition to the extent of any overlap with the *Seminole* award the Commission stated that:

 * * * the Creek plaintiffs may not mount a collateral attack through proceedings in this Docket for it is well-established that the order or determination of an administrative body, acting within its jurisdiction and under authority of law, is not subject to collateral attack in the absence of fraud or bad faith, the only method of attack being by appeal as permitted by statute. Callanan Road Improvement Company v. United States, et al., 345 U.S. 507, [73 S.Ct. 803, 97 L.Ed. 1206] (1953), affirming 107 F.Supp. 184 (D.C.N.Y., 1952), reh. den. 345 U.S. 978, [73 S.Ct. 1119, 97 L.Ed. 1392] (1953).

22 Ind.Cl.Comm. at 14. In our view, the Commission erred.

It was evidently the opinion of the Commission that if appellants' petition were not dismissed to the extent of an overlap, appellants would be in a position to launch a forbidden collateral attack on the crucial determination of fact made in *Seminole*, *i.e.*, that the Seminoles had Indian title to virtually all of Florida south and east of the Old Spanish Road at the time of the Camp Moultrie Treaty. This was a misapplication of the doctrine of collateral attack.

▆▆ In holding that the appellants' claim, to the extent of any overlap with the *Seminole* award, constituted an invalid collateral attack on the earlier decision, the Commission was saying, in essence, that the administrative determination in *Seminole* is res judicata for purposes of the present litigation. *See* 2 K. Davis, Administrative Law Treatise ¶ 18.10, at 612 (1958). It is well established, however, that res judicata has

conclusive force only between the parties to the prior action or those in privity with them. *See* 1B J. Moore, Federal Practice ¶ 0.411, at 1251 (2d ed. 1965), and cases cited therein. The Creek appellants in no way participated in the *Seminole* proceedings and were in privity with neither party in that case. The Commission was, therefore, in error in utilizing res judicata to diminish appellants' original petition.

The *Callanan Road Improvement Co.* case cited by the Commission is inapposite. In that case, Callanan was seeking to attack an order of the Interstate Commerce Commission affecting a certificate Callanan had purchased from Hutton. The Commission's order had been handed down while Hutton owned the certificate. Although the Court did not so state, the basis of its holding that Callanan was barred from collaterally attacking the order was undoubtedly that Callanan, as successor in interest to Hutton, was in privity with Hutton and, as such, was barred by res judicata.

The Government argues that the appellants were put on notice by the Government's answer in 1955 of the possibility of an overlap and that the appellants could have then intervened in the *Seminole* proceedings or sought consolidation of the two cases.[13] Having had notice of the possibility of an overlap and the opportunity to intervene or seek consolidation, the Government argues, appellants are bound by *Seminole* just as though they had been actual parties to that litigation. We know of no rule of law, however, which requires that a person not otherwise bound by a judgment be bound merely because the person could have intervened or participated in the proceedings leading up to that judgment. In order to protect itself, the Government, here a potential double payor, should have taken the initiative to consolidate. Had the cases been consolidated at the proper time all parties

would have been bound by the ultimate judgment and needless litigation could have been averted.

*Conclusion*

Accordingly, we reverse the Commission's interlocutory order of November 13, 1969, insofar as it dismisses or diminishes appellants' original petition to the extent of any overlap between the lands claimed in the petition and the lands awarded in *Seminole*. The Commission's order is, in all other respects, affirmed, and the matter is returned to the Commission for further appropriate proceedings on the original petition.

Affirmed in part, reversed in part, and remanded.

---

13. It should be pointed out that the Rules of the Indian Claims Commission provide neither for intervention nor consolidation.

Since consolidation was effected in *Seminole*, however, it is presumed that consolidation is possible.